## STATE OF CONNECTICUT *v.* HERIBERTO CRUZ
## (SC 16299)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued November 30, 2001—officially released April 2, 2002

*Richard S. Cramer*, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Anne Mahoney*, assistant state's attorney, for the appellee (state).

*Richard Blumenthal*, attorney general, and *Maureen Regula* and *Susan T. Pearlman*, assistant attorneys general, filed a brief for the department of children and families as amicus curiae.

*Opinion*

ZARELLA, J. A jury found the defendant, Heriberto Cruz, guilty of five counts of sexual assault in the first degree in violation of General Statutes (Rev. to 1991) § 53a-70 (a) (2)[1] and two counts of risk of injury to a child in violation of General Statutes (Rev. to 1991)

---

[1] General Statutes (Rev. to 1991) § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person . . . (2) engages in sexual intercourse with a [person] under thirteen years of age."

Although § 53a-70 (a) was amended in 1992; see Public Acts 1992, No. 92-87, § 3; the language of § 53a-70 (a) (2) remained unchanged between 1991 and 1993, the period of time during which the acts that led to the defendant's convictions had occurred. We refer to § 53a-70 (a) (2), as revised to 1991, for convenience.

§ 53-21,[2] arising from two separate informations that were consolidated for trial. The trial court thereafter rendered judgments in accordance with the jury's verdicts and sentenced the defendant to a total effective term of imprisonment of twenty-two years, execution suspended after seventeen years, and five years probation. The defendant appealed to the Appellate Court, which affirmed the trial court's judgments of conviction. *State* v. *Cruz*, 56 Conn. App. 763, 772, 746 A.2d 196 (2000). We granted the defendant's petition for certification to appeal[3] limited to the issue of whether the Appellate Court correctly determined that the trial court properly had admitted into evidence, under the medical treatment exception to the hearsay rule, statements made to a social worker by a child who was sexually assaulted identifying the defendant as the perpetrator of the sexual assaults. See *State* v. *Cruz*, 253 Conn. 901, 753 A.2d 938 (2000). We conclude that those statements properly were admitted under the medical treatment exception to the hearsay rule and, therefore, we affirm the judgment of the Appellate Court.

The jury reasonably could have found the following relevant facts. The defendant sexually assaulted A[4] on various occasions between May 1, 1991, and December

[2] General Statutes (Rev. to 1991) § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

The text of § 53-21 remained the same between 1991 and 1993, the period of time during which the acts that led to the defendant's convictions had occurred. We refer to § 53-21, as revised to 1991, for convenience.

[3] Following certification, we granted the application of the department of children and families (department) to file an amicus curiae brief, which the department subsequently filed.

[4] Pursuant to General Statutes § 54-86e, we do not refer to the victim by name in this opinion in order to protect the victim's privacy interests.

16, 1993. *State* v. *Cruz*, supra, 56 Conn. App. 764–65. The assaults occurred in residences that the defendant shared with A, A's mother, who also was the defendant's girlfriend, and A's two younger siblings,[5] one of whom was the defendant's biological daughter. See id. The family lived in an apartment in Hartford from May 1, 1991, through April 30, 1993. Id. The family thereafter relocated to an apartment in Manchester. Id., 765. The assaults ended when the defendant moved out of the Manchester residence in December, 1993. Id.

A remained silent about the sexual assaults until the summer of 1995, when she told an older school friend that the defendant had sexually assaulted her. See id. Although the friend urged A to tell her mother about the assaults, A did not inform her mother until December 14, 1995. Id.

Upon learning of the sexual abuse, A's mother immediately sought help from Frederick J. Rau, an obstetrician-gynecologist who had been treating A for abdominal pelvic pain since March, 1993. Id., 765, 766. Rau spoke with Diane Edell, a social worker and the program director of a center for evaluating sexually abused children (abuse evaluation center) at Saint Francis Hospital and Medical Center (hospital), and arranged for A to be examined at the hospital. Id., 765. Edell, who also evaluated complaints of sexual abuse for the abuse evaluation center, interviewed A on December 14 and December 22, 1995. Id. A spoke openly about the sexual abuse because she believed that Edell was a physician. Id. The December 22 session was videotaped while Detective Robert Nelson of the Hartford police department and Detective Russell Wood of the Manchester police department observed the interview through a one-way mirror. Id. Although the detectives

---

[5] We hereinafter refer to the defendant, A, A's mother and A's two younger siblings collectively as the "family."

received a videotape of Edell's interview of A, neither officer interviewed A. Id., 765–66.

Thereafter, on January 10, 1996, Elaine Elizabeth Yordan, a pediatrician and associate director of the section of adolescent medicine in the hospital's department of pediatrics, examined A. Id., 766. The results of Yordan's examination neither proved nor disproved that A had been sexually assaulted. Id. Although Yordan possessed Rau's medical history of A, she did not use it in her diagnosis and did not view the videotape of Edell's interview. Id.

At trial, Edell testified that she spoke with Rau and A's mother on December 14, 1995, and, on the basis of those conversations, "thought it was a good idea to see [A] right away." Edell explained that the purpose of a diagnostic interview was to help "the physician proceed with the medical evaluation based on what the child is claiming happened to [him or her] . . . ." Edell further testified that, following her interview with a child, she would give the child's parent a general summary of the substance of the interview, would make recommendations regarding mental health follow-up, including whether crisis counseling or long-term or short-term therapy was warranted, and would prepare a report of the interview that would be shared with the examining physician.

Yordan also testified at the defendant's trial. She could not recall whether she had spoken to Edell prior to examining A but stated that her usual practice "is to speak [with] the interviewer," if the child has been interviewed, to determine the nature of the allegations. Yordan further testified that she had not spoken with Rau before examining A and that she had obtained a medical history from A's mother prior to examining A.

On appeal to the Appellate Court, the defendant asserted, inter alia, that the trial court improperly

allowed into evidence Edell's testimony regarding A's statements identifying the defendant as the perpetrator under the medical treatment exception to the hearsay rule. See *State* v. *Cruz*, supra, 54 Conn. App. 766. The Appellate Court disagreed, concluding that the trial court properly had allowed Edell's testimony. Id., 771. The Appellate Court reasoned that "A's complaint to Edell did not lack trustworthiness because A thought Edell was a physician . . . [and because] Edell was part of the chain utilized to elicit information for future medical and psychological treatment." Id., 770–71.

On appeal to this court, the defendant renews his claim that A's statements to Edell did not fall within the medical treatment exception to the hearsay rule. Specifically, the defendant asserts that the exception is inapplicable under the particular circumstances of the present case because Edell is a social worker and not a physician, psychologist or psychiatrist. He further contends that A's statements do not come within the exception because Edell's interview of A was not within a chain of medical care in view of the fact that the substance of that interview never was utilized by a physician, psychologist or psychiatrist in diagnosing or treating A, and the fact that A never received any treatment for the psychological trauma that A may have suffered as a result of the sexual abuse. We disagree with the defendant and conclude that the medical treatment exception to the hearsay rule applies to statements made by a sexual assault victim to a social worker who is acting within the chain of medical care, as long as those statements are made for the purpose of obtaining medical diagnosis or treatment and are pertinent to the diagnosis or treatment sought. See, e.g., *State* v. *Kelly*, 256 Conn. 23, 44, 770 A.2d 908 (2001).

"The hearsay rule . . . is premised on the theory that out-of-court statements are subject to particular hazards. The declarant might be lying; he might have

misperceived the events which he relates; he might have faulty memory; his words might be misunderstood or taken out of context by the listener. And the ways in which these dangers are minimized for in-court statements—the oath, the witness' awareness of the gravity of the proceedings, the jury's ability to observe the witness' demeanor, and, most importantly, the right of the opponent to cross-examine—are generally absent for things said out of court.

"Nonetheless, the . . . [r]ules of [e]vidence also recognize that some kinds of out-of-court statements are less subject to these hearsay dangers, and therefore except them from the general rule that hearsay is inadmissible." (Internal quotation marks omitted.) *State* v. *Schiappa*, 248 Conn. 132, 146, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999), quoting *Williamson* v. *United States*, 512 U.S. 594, 598, 114 S. Ct. 2431, 129 L. Ed. 2d 476 (1994). One such category covers statements made by a patient to a physician for the purpose of obtaining medical treatment. E.g., *State* v. *Kelly*, supra, 256 Conn. 44; *State* v. *DePastino*, 228 Conn. 552, 565, 638 A.2d 578 (1994).

The rationale underlying the medical treatment exception to the hearsay rule is that "the patient's desire to recover his health . . . will restrain him from giving inaccurate statements to a physician employed to advise or treat him." *Brown* v. *Blauvelt*, 152 Conn. 272, 275, 205 A.2d 773 (1964), overruled on other grounds by *George* v. *Ericson*, 250 Conn. 312, 736 A.2d 889 (1999); see also C. Tait, Connecticut Evidence (3d Ed. 2001) § 8.20.2, p. 634 ("[the] exception is based on the theory that a person who consults a doctor for advice or treatment will be motivated by a desire to recover . . . and that person will therefore refrain from giving inaccurate statements to the individual advising or treating him or her"). "Since statements made to physicians are usually made in response to questions, many

are not spontaneous. Instead, their reliability is assured by the likelihood that the patient believes that the effectiveness of the treatment depends on the accuracy of the information provided to the doctor, which may be termed a selfish treatment motivation." (Internal quotation marks omitted.) 2 C. McCormick, Evidence (5th Ed. 1999) § 277, p. 233. Thus, "[o]ut-of-court statements made by a patient to a physician may be admitted into evidence if the declarant was seeking medical diagnosis or treatment, and the statements are reasonably pertinent to achieving those ends. . . . A physician, who is consulted by a patient for the purpose of obtaining from [the physician] professional medical treatment or advice incidental thereto, may testify to [his or her] opinion even though it is based, in whole or in part, on statements made . . . by the patient; and, of course, [the physician] may also testify to such statements." (Citation omitted; internal quotation marks omitted.) *State* v. *Kelly*, supra, 256 Conn. 44.

In *State* v. *Maldonado*, 13 Conn. App. 368, 369, 374 and n.3, 536 A.2d 600, cert. denied, 207 Conn. 808, 541 A.2d 1239 (1988), the Appellate Court concluded that, under the medical treatment exception to the hearsay rule, a Spanish-speaking hospital security guard enlisted by the examining physician to assist in taking the medical history of a six year old sexual abuse victim, who spoke only Spanish, could testify at trial about nonverbal assertions that the victim made, which indicated that her father had sexually abused her. In *Maldonado*, the defendant had brought his child to the hospital because she was experiencing significant vaginal discharge. Id., 369. Upon the child's return to the hospital the following evening, "the examining physician [who did not speak Spanish] enlisted the aid of a Spanish-speaking security guard to take [the child's] medical history." Id. "Out of the presence of the defendant and the [examining physician], [the child] indi-

cated to the security guard, without speaking but by nodding her head, that she . . . had been molested and that the molesting individual was her father." Id. The security guard was unsuccessful in attempting to get the child to repeat her responses in the presence of the examining physician. Id., 369–70. The trial court permitted the security guard to testify at trial concerning, inter alia, the child's assertions that her father was the abuser. See id., 370, 374.

In determining that the child's assertions fell within the medical treatment exception to the hearsay rule, the Appellate Court reasoned that the security guard was acting within the chain of medical care: in light of the language barrier between the examining physician and the child, the physician asked the security guard to assist in obtaining the child's medical history. See id., 372, 374 n.3. The court further reasoned that the child's assertions were reliable in light of the child's awareness that the security guard was questioning her on behalf of the examining physician and that she was aware that she had a condition that necessitated the administration of medical treatment. Id., 372.

The Appellate Court came to the same conclusion in the present case. Specifically, the Appellate Court concluded that A's statements fell within the medical treatment exception to the hearsay rule because A had made them in furtherance of obtaining medical treatment and because A had made them to an individual within the chain of medical care. State v. Cruz, supra, 56 Conn. App. 770. The court further concluded that A's statements were reliable because "A thought she was talking to a physician and therefore was seeking medical diagnosis or treatment." (Internal quotation marks omitted.) Id. In so concluding, the court noted: "It is not unreasonable to . . . conclude that because Rau, A's treating physician, sent A and [A's] mother to the hospital, specifically calling Edell whom he knew to be a social worker with advanced training in therapy

and public health, and the [the program director of the abuse evaluation center], that statements by A to Edell would be reasonably pertinent to future medical diagnosis or treatment." Id. We agree.

The rationale for excluding from the hearsay rule statements that a patient makes to a physician in furtherance of obtaining medical treatment applies with equal force to such statements made to other individuals within the chain of medical care. In each case, we presume that such statements are inherently reliable because the patient has an incentive to tell the truth in order to obtain a proper medical diagnosis and treatment. See, e.g., 2 C. McCormick, supra, § 277, p. 233. In so concluding, we overrule *State* v. *Barile*, 54 Conn. App. 866, 871–72, 738 A.2d 709 (1999), to the extent that it holds that the medical treatment exception to the hearsay rule does not cover statements made to a social worker who is in the chain of medical care.[6] We hold today that statements made by a sexual assault victim to a social worker who is acting within the chain of medical care may be admissible under the medical treatment exception to the hearsay rule.

Turning to the facts of the present case, the record amply demonstrates that A's mother had taken A to the hospital for medical treatment and advice pertaining

[6] In *Barile*, the Appellate Court concluded that the trial court improperly had admitted into evidence, under the medical treatment exception to the hearsay rule, a child abuse victim's statements to a treating social worker because they were not made to a "physician." *State* v. *Barile*, supra, 54 Conn. App. 871–72. The Appellate Court nonetheless concluded that the social worker's testimony was admissible under the constancy of accusation doctrine. Id., 872; cf. *State* v. *Troupe*, 237 Conn. 284, 304 & n.19, 677 A.2d 917 (1996) (limitation on constancy of accusation testimony to fact and timing of sexual assault victim's statement does not affect whether details of statement may be substantively admitted under hearsay exceptions). In *Barile*, it was unclear whether the social worker was acting in conjunction with other medical personnel, such as a physician, in treating the victim. See generally *State* v. *Barile*, supra, 871.

thereto, and that Edell, a social worker employed by the hospital, was acting within the chain of medical care when she interviewed A.[7] Additionally, A's own belief that if she told Edell exactly what had happened, then Edell could help her, demonstrates A's own understanding that her mother brought her to the hospital for treatment. We, therefore, reject the defendant's claim that there is no evidence in the record that A was seeking medical treatment.

We also reject the defendant's argument that Edell was acting not as a social worker but, rather, as an

---

[7] At trial, A's mother testified that she had called Rau on the day that A informed her of the sexual abuse and that Rau had visited her home to do an investigation that same day. A's mother further testified that Rau had instructed her to take A to the hospital. In explaining his conversation with A's mother, Rau testified: "What I did was to talk with her about where she should go from here and—and what kind of care that we can provide for [A]. And I also referred her to the . . . abuse [evaluation] center at [the] [h]ospital."

Additionally, Edell testified that she had spoken with A's mother and Rau and, on the basis of those conversations, "thought it was a good idea to see [A] right away. And because of the general upset of the family, we saw her that day." Edell further testified that, as the program director of the abuse evaluation center, she coordinated intake and conducted diagnostic interviews. Edell explained the purposes behind the diagnostic interview as follows: "[I]t helped the physician proceed—and still does—helps the physician proceed with the medical evaluation based on what the child is claiming happened to [him or her]: how much needs to be done, whether they need to have cultures done or not. . . . The doctor really needs to know how serious is what they're saying, should they reschedule an appointment, etc. So it really guides them in terms of what they do. The other thing is that we do make recommendations regarding mental health issues regarding treatment issues for the child." Edell also testified that, following an interview, she would give the child's parent a general summary of the interview, would make recommendations regarding mental health counseling and therapy, and would prepare a report of the interview, which would be shared with the physicians at the hospital.

Yordan testified that she had not spoken with Rau prior to examining A, but that the hospital "had a copy of some of . . . Rau's medical reports regarding [A]." She further testified that, although she did not recall whether she had spoken with Edell prior to examining A, her "usual practice [was] to speak [with] the interviewer," if the child had been interviewed before the examination, in order to determine "the exact nature of the allegation."

agent of the Manchester and Hartford police departments when she interviewed A. The record demonstrates that Edell, who as a social worker, was statutorily obligated to report suspected child abuse under General Statutes (Rev. to 1995) § 17a-101,[8] had notified the Manchester police department of A's disclosure of sexual abuse sometime after the December 14, 1995 segment of Edell's interview, at which A had disclosed the abuse, but before December 22, 1995. The record further discloses that the Manchester police received a sworn statement from A's mother on December 21, 1995. There is no evidence that Edell was, in fact, employed by either police department or that she had assisted in any capacity in the departments' respective investigations of the alleged abuse. The record does disclose, however, the joint efforts of the abuse evaluation center, the department of children and families and the law enforcement community to conduct interviews of child victims of sexual abuse in a manner that is intended to spare the victims any additional trauma.[9]

[8] General Statutes (Rev. to 1995) § 17a-101 provides in relevant part: "(b) Any . . . social worker . . . who has reasonable cause to suspect or believe that any child under the age of eighteen has had physical injury or injuries inflicted upon him by a person responsible for such child's or youth's health, welfare or care . . . or is in a condition which is the result of maltreatment such as, but not limited to . . . sexual abuse . . . shall report or cause a report to be made in accordance with the provisions of subsection (c) of this section . . . .

"(c) An oral report shall be made immediately by telephone or otherwise, to the state commissioner of children and families or his representative, or the local police department or the state police to be followed within seventy-two hours by a written report to the commissioner of children and families or his representative . . . ."

[9] Since 1996, General Statutes § 17a-106a has guided the coordinating efforts of different state agencies in child abuse cases. That statute currently provides in relevant part: "(a) The Commissioner of Children and Families . . . and the appropriate state's attorney [may] establish multidisciplinary teams for the purpose of reviewing particular cases or particular types of [child abuse and neglect] cases or to coordinate the prevention, intervention and treatment [of child abuse and neglect] in each judicial district . . . . The purpose of such multidisciplinary teams is to advance and coordinate the prompt investigation of suspected cases of child abuse or neglect, to

Accordingly, Edell testified that it was the practice of the abuse evaluation center to videotape the interviews of child abuse victims in order to spare them the additional trauma that could result from being interviewed repeatedly by numerous state agencies and police departments that are conducting independent investigations into the alleged abuse. Edell further testified that, following an interview in which there has been a disclosure of sexual abuse, the hospital would forward a copy of the videotaped interview, along with a copy of the interviewer's report, to the department of children and families and the local police department, and that the hospital would retain the originals. Detective Wood of the Manchester police department and Detective Nelson of the Hartford police department also testified that, upon receiving a complaint of child sexual abuse, their respective departments would have the abuse evaluation center interview the victim whenever practical. None of these circumstances changed Edell's

reduce the trauma of any child victim and to ensure the protection and treatment of the child. The head of the local law enforcement agency or his designee may request the assistance of the Division of State Police within the Department of Public Safety for such purposes.

"(b) Each multidisciplinary team shall consist of at least one representative of each of the following: (1) The state's attorney of the judicial district of the team, or his designee; (2) the Commissioner of Children and Families, or his designee; (3) the head of the local or state law enforcement agencies, or his designee; (4) a health care professional with substantial experience in the diagnosis and treatment of abused or neglected children, who shall be designated by the team members; (5) a member, where appropriate, of a youth service bureau; (6) a mental health professional with substantial experience in the treatment of abused or neglected children, who shall be designated by the team members; and (7) any other appropriate individual with expertise in the welfare of children that the members of the team deem necessary. . . ." General Statutes § 17a-106a; see also Conn. Joint Standing Committee Hearings, Human Services, Pt. 3, 1999 Sess., p. 551, remarks of Alvin Wilson, general counsel and director of government relations for the department of children and families ("[t]he specific purpose of these teams is to, in essence, avoid multiple interviews and prevent undue trauma of children who have already been traumatized by child abuse and it's also to ensure that the necessary information and necessary services are provided to those children").

essential role within the chain of medical care when she had conducted the interview of A. We, therefore, reject the defendant's contention that the presence of officers from the Manchester and Hartford police departments at Edell's interview of A caused Edell to become an agent of local law enforcement.

Turning to the relevance prong of the medical treatment exception, the defendant claims that A's statements to Edell identifying him as the perpetrator should not have been admitted into evidence because he was not a member of A's household when A disclosed the sexual abuse and, therefore, the defendant's identity as the perpetrator was not relevant to A's medical treatment. In so arguing, the defendant relies on *State* v. *Dollinger*, 20 Conn. App. 530, 568 A.2d 1058, cert. denied, 215 Conn. 805, 574 A.2d 220 (1990), for the proposition that the identity of the perpetrator is only relevant to the victim's medical diagnosis and treatment when there is a possibility of recurrence because the perpetrator remains in the victim's household. See id., 535 ("[i]f the sexual abuser is a member of the child victim's immediate household, it is reasonable for a physician to ascertain the identity of the abuser to prevent recurrences and to facilitate the treatment of psychological and physical injuries").

We recently rejected a similarly narrow interpretation of the medical treatment exception to the hearsay rule in *State* v. *Kelly*, supra, 256 Conn. 23. In *Kelly*, the defendant, Alex Kelly, had sexually assaulted the victim in an automobile. Id., 28–29. On appeal to this court, Kelly cited *State* v. *DePastino*, supra, 228 Conn. 552, a case in which the defendant, Keith DePastino, had sexually abused his girlfriend's three year old daughter and the couple's eighteen month old daughter in an apartment in which they all resided; id., 555; for the proposition that statements concerning the identity of the perpetrator of sexual abuse fall within the medical

treatment exception only when those statements are made to a physician by a child who was sexually assaulted in the home. See *State* v. *Kelly*, supra, 45. In rejecting such a narrow interpretation of the medical treatment exception, we reiterated our reasoning in *DePastino* that "testimony pertaining to the identity of the defendant and the nature of the sexual assault [are] wholly relevant and pertinent to proper diagnosis and treatment of the resulting physical and psychological injuries of sexual assault." Id., citing *State* v. *DePastino*, supra, 565. We concluded that "[i]n any sexual assault, the identity of the perpetrator undoubtedly is relevant to the physician to facilitate the treatment of psychological and physical injuries." (Internal quotation marks omitted.) *State* v. *Kelly*, supra, 45. For those same reasons, we reject the defendant's claim that A's statements to Edell identifying the defendant as the perpetrator were irrelevant to A's efforts to obtain medical treatment because the defendant left the household after sexually abusing A. We, therefore, agree with the Appellate Court that the trial court properly allowed Edell to testify, pursuant to the medical treatment exception to the hearsay rule, regarding A's statements to Edell identifying the defendant as the person who sexually assaulted A.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.