LESLIE MILLIUN *v.* NEW MILFORD
HOSPITAL ET AL.
(AC 30875)

DiPentima, C. J., and Bear and Borden, Js.

82

Argued January 11—officially released May 31, 2011

*David S. Golub*, with whom were *Jonathan M. Levine* and, on the brief, *Marilyn J. Ramos*, for the appellant (substitute plaintiff).

*Michael G. Rigg*, with whom, on the brief, were *Amy F. Goodusky* and *Roland F. Young III*, for the appellee (named defendant).

*Opinion*

BORDEN, J. In this medical malpractice action, the plaintiff, Lynnia Milliun, the conservatrix of her sister, Leslie Milliun,[1] appeals from the summary judgment rendered by the trial court in favor of the defendant New Milford Hospital.[2] On appeal, the plaintiff claims that the court improperly (1) concluded that the opinions of Leslie's treating physicians were inadmissible on the issue of causation, (2) refused to compel certain treating physicians to be deposed and (3) denied her request for an extension of time to respond to the defendant's motion for summary judgment. Because we agree with the plaintiff on her first and second claims, we do not reach her third claim, and we reverse the judgment of the trial court granting the defendant's motion for summary judgment.

---

[1] Leslie Milliun had been named as the plaintiff in the original complaint, filed in October, 2004. In March, 2007, the court granted her motion to substitute Lynnia Milliun as the plaintiff.

[2] The substitute plaintiff's amended complaint also names Janice Sumner, a physician, and Associated Family Physicians, P.C., as defendants. Those defendants are not involved in this appeal and, therefore, all references herein to the defendant are to New Milford Hospital.

The record reveals the following factual and procedural history. The plaintiff claims that the defendant was negligent in the treatment of Leslie when she was admitted into its care in July, 2002. Prior to that date, she had been a patient in the defendant's care in connection with the treatment of her stiff man syndrome (SMS). In her amended complaint, the plaintiff alleged that, while in the defendant's care, Leslie suffered severe respiratory dysfunction, during which time her rate of breathing was reduced to two breaths per minute for a period of four minutes. As a result of this anoxic incident, the plaintiff further alleged, Leslie had suffered severe injury to her cognitive functioning, including memory loss, loss of motor function and speech impairment. The plaintiff claimed that Leslie's brain injury was caused by the defendant's negligence, namely, failure to monitor Leslie properly, failure to respond to her respiratory dysfunction and the administration of medication that is known to cause respiratory dysfunction.

In April, 2003, prior to the commencement of this action, Leslie had sought treatment at the Mayo Clinic in Rochester, Minnesota, in connection with her cognitive health. At the Mayo Clinic, she first was seen by Kathleen M. McEvoy, a physician. McEvoy reported that Leslie had brought extensive outside records with her, along with an investigative report from the department of health regarding the anoxic incident that occurred while she was in the care of the defendant. McEvoy's admittance notes indicated that the plaintiff also reported this event to her. At that time, McEvoy reported in her evaluation that Leslie was suffering from a severe neurological disorder, and, although some manifestations suggested SMS, "she obviously has additional deficits and involvement that would not be expected with [SMS] alone."

In February, 2005, Leslie returned to the Mayo Clinic to address her worsening cognitive health. In her evalu-

ation report, McEvoy stated her impressions of Leslie's condition as follows: "It is still my clinical impression based on the temporal profile of the onset of her symptoms, that the patient has a primary autoimmune disorder consistent with [SMS], which by history was associated with dysarthria but no cognitive impairment, along with a superimposed anoxic encephalopathy which developed by her report of July 10, 2002 . . . ."

McEvoy then referred Leslie to physicians Keith A. Josephs and Stefan A. Dupont at the Mayo Clinic's behavioral neurology unit for the purpose of assessing her cognitive functions. Upon his neurological examination, Dupont, a resident at the Mayo Clinic, reported in his neurology consult that her "cognitive dysfunction appears to be multidomain in nature, and based on the recounted temporal events, this all seems to have occurred because of anoxic encephalopathy suffered during her respiratory arrest in 2002."

Josephs' evaluation echoed Dupont's conclusion. He reported as follows: "It is my opinion that [Leslie's] cognitive impairment is secondary to whatever event occurred or whatever transpired in 2002. The family member tells me that there was anoxia and that there was a change after that. Therefore, one must conclude that her cognitive impairment was secondary to the event that occurred in 2002. Arguing for this being the process of her cognitive impairment also is the fact that she has not had any significant progression since 2002. The cognitive impairment in my opinion is not related to the patient's diagnosis [of SMS] and is not in keeping with a neurodegenerative syndrome given the lack of progression." Josephs went on to diagnose her as suffering from "cognitive impairment (static encephalopathy secondary to anoxic brain damage)."

In July, 2008, the plaintiff filed the underlying amended complaint in which she alleged that the defen-

dant was negligent in its care and treatment of Leslie. The court scheduled trial to commence on January 21, 2009,[3] and the plaintiff was required to disclose all of her expert witnesses by September 15, 2008. On that date, the plaintiff disclosed nine expert witnesses, including McEvoy and Josephs. All were identically disclosed on the issues of causation and damages.

In November, 2008, the defendant filed a motion to preclude the plaintiff from calling any of her expert witnesses at trial, contending that she had failed to make them available for depositions and, therefore, that it would be prejudiced by having to conduct pretrial discovery so close to the forthcoming trial date. At a subsequent hearing before the court on the motion to preclude, counsel for both parties indicated that they were experiencing difficulty deposing the plaintiff's experts, as the Mayo Clinic had an internal policy that limited the depositions of its treating physicians. In response to the court's concerns, the plaintiff represented that none of the witnesses from the Mayo Clinic had been retained as experts to be called at trial but instead had been disclosed as experts for the purpose of introducing their medical records.[4] At the conclusion of the hearing, the parties agreed to take the depositions

---

[3] The trial of this action originally had been scheduled to commence in August, 2007. After being substituted as the plaintiff in March, 2007; see footnote 1 of this opinion; the plaintiff retained new counsel in April, 2007, and, over opposition from the defendant, received further continuances of the trial date.

[4] The following colloquy transpired on that point:

"The Court: . . . So, how are you going to work around that? It's your problem. . . . They are your experts.

"[The Plaintiff's Counsel]: They are treating physicians. I did not pick them. They weren't specially retained.

"The Court: Are all . . . of them flying here to Connecticut for trial?

"[The Plaintiff's Counsel]: No.

"The Court: So, how are you using . . . them?

"[The Plaintiff's Counsel]: I'm using their medical records."

by teleconference, limited to questions concerning the information contained in the treating physicians' medical reports.

On January 26, 2009, the court held a hearing on the status of the depositions. At the hearing, the defendant again expressed concern over not having had the opportunity to depose all of the plaintiff's experts. The court thereafter stressed to the parties that the defendant had the right to obtain the deposition testimony of any treating physicians on whose medical reports the plaintiff intended to rely at trial. The plaintiff then explained that, because the witnesses were not within her control, the most appropriate action would be to have a commission appointed in order to compel the experts to attend their depositions in Minnesota in accordance with General Statutes § 52-148c.[5] The following day, the plaintiff filed a motion for the appointment of a commission to summon by subpoena and to obtain the depositions of the treating physicians.

On January 29, 2009, the parties reported back to the court that no additional depositions for the plaintiff's Mayo Clinic witnesses had been taken. The defendant thereafter repeated its request that, because of undue prejudice and delay in the taking of their depositions, the plaintiff should be precluded from relying on the medical reports of the treating physicians on the issue of causation. In response, the plaintiff asserted that the medical records themselves were sufficient evidence to establish the cause of Leslie's cognitive impairments and, on the court's request, she identified the portions of the medical reports that she claimed contained ade-

---

[5] "General Statutes § 52-148c allows a party to apply to the court for a commission to take the deposition of an out-of-state witness. Once the commission is granted by the court in this state, a subpoena can be obtained in the proposed deponent's state to force the deponent to attend a deposition in his state." *Struckman* v. *Burns*, 205 Conn. 542, 552, 534 A.2d 888 (1987).

quate opinions on causation. Specifically, the plaintiff pointed to the portion of McEvoy's 2005 entry in which she stated that, in her clinical opinion, Leslie was suffering from SMS "along with a superimposed anoxic encephalopathy which developed by her report of July 10, 2002." The plaintiff posited that such a conclusion could be introduced in lieu of live expert testimony in order to establish the element of causation.

At that point, the court expressed concern over the fact that McEvoy's impressions appeared to be based exclusively on the plaintiff's and Leslie's own reports of the anoxic incident. After much discussion, the court ruled that the Mayo Clinic records, without any supporting testimony, were insufficient to establish a proper foundation for expert medical opinion on causation because they were predicated on layperson opinion and inadmissible hearsay. The court, over objection from the defendant,[6] proceeded to grant in part the plaintiff's motion for the appointment of a commission to permit the taking of McEvoy's and Josephs' depositions, and indicated that if those physicians did not testify adequately to support the basis of the plaintiff's theory on causation, their records would only be admissible insofar as they reflected Leslie's treatment at the Mayo Clinic, with any portions connected to the causation of her injuries being redacted.

On February 2, 2009, the parties went forward with Josephs' deposition. At the outset, counsel for the Mayo Clinic, appearing on behalf of Josephs, stated that he would not be opining on the issues of standard of care or causation and that he would only testify as to his

[6] On January 30, 2009, the defendant filed an objection to the plaintiff's motion for the appointment of a commission to take the out-of-state depositions of the Mayo Clinic physicians, claiming, inter alia, that the experts could not be compelled to testify as causation experts against their will.

care of Leslie as a treating physician. Upon his initial examination by the defendant, Josephs testified, consistent with his counsel's opening remarks, that it was not his intent to give an opinion as to whether the defendant's care and treatment of Leslie led to an anoxic event and that he was unaware of what in fact caused the anoxia. Additionally, Josephs stated that he had not reviewed the defendant's records of Leslie's hospitalization, and that the circumstances surrounding her anoxic event were relayed to him by Leslie and the plaintiff.

During the plaintiff's examination, however, Josephs testified that there was information available to him that indicated that while Leslie was in the care of the defendant her rate of breathing was reduced to somewhere between one and four breaths per minute and that upon his review of the materials available to him he concluded that her cognitive deficits were caused by this anoxic event.[7] Although both sides, and the court, were under the assumption that Josephs' examination would last four hours, counsel for the Mayo Clinic unilaterally terminated the deposition after the second hour of questioning.

The following day, the plaintiff issued subpoenas seeking to compel the continued deposition of Josephs

---

[7] At Josephs' deposition, counsel for the plaintiff undertook the following examination:

"Q. You understand how hypoxia causes brain damage, correct?

"A. Yes.

"Q. And after you and Dr. Dupont reviewed whatever materials were available to you and whatever you thought was relevant and important, you came to the conclusion that her cognitive deficits were being caused as a result of that incident in July, 2002? . . .

"A. That was . . . based on the history I got, yes. . . .

"Q. All right. The information that was available to you was that she was on considerable amounts of Valium and was hypopneic and that she was breathing somewhere between one and four times per minute, correct? . . .

"A. Yes."

and the deposition of McEvoy, and counsel for the Mayo Clinic filed a motion for a protective order seeking to preclude the plaintiff from completing Josephs' deposition and from conducting McEvoy's deposition, contending that these examinations constituted an annoyance and were unduly burdensome. The defendant joined in the Mayo Clinic's motion and, in its supplemental brief in opposition to the continued depositions, argued that neither Josephs nor McEvoy could be compelled to testify as to their expert medical opinions on causation. The court agreed and vacated its previous order granting commissions for the depositions of Josephs and McEvoy. Accordingly, the court advised counsel for the Mayo Clinic that Josephs and McEvoy were no longer under subpoena.

On February 6, 2009, the defendant filed a motion for permission to file a motion for summary judgment. The court granted the motion for permission on February 9, 2009, and the defendant filed its motion for summary judgment that day. The court also ordered the plaintiff to file her opposition to the motion the following day.[8]

On February 17, 2009, the court heard oral argument on the defendant's motion for summary judgment.[9] The defendant claimed that it was entitled to summary judgment because the plaintiff could not establish the ele-

---

[8] On the morning of February 10, 2009, the plaintiff filed a formal request for an extension of time to respond to the defendant's summary judgment motion. The plaintiff claimed that, pursuant to Practice Book § 17-45, it would be improper for the motion to be heard less than thirty days from the filing of her request. The plaintiff's request for an extension was denied.

[9] At the argument, counsel for the plaintiff attempted to submit an affidavit from the plaintiff, dated February 17, 2009, explaining that she had provided the Mayo Clinic with extensive medical records regarding Leslie's prior treatment and that McEvoy had explained to both her and her sister that the decreased level of oxygen available to Leslie's brain, which McEvoy described as anoxia, had caused permanent impairment to Leslie's cognitive functioning. The court refused to consider the affidavit.

ment of causation by expert testimony. Specifically, it argued that the treating physicians' opinions contained within their medical reports were insufficient to establish that the alleged injuries were caused by the defendant. The court agreed and granted the defendant's motion for summary judgment. This appeal followed. Additional facts will be set forth as necessary.

The plaintiff claims that the court improperly granted the defendant's motion for summary judgment for three reasons, namely, that it improperly (1) determined that the treating physicians' opinions on causation as stated in their medical records were inadmissible, (2) precluded the depositions of Josephs and McEvoy, and (3) denied her request for an extension of time to respond to the defendant's motion for summary judgment. We agree with the plaintiff that the court improperly granted the defendant's motion for summary judgment.

We begin our analysis by setting forth the well established standard of review that guides our analysis. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . Our review of the trial court's decision to grant [the defendant's] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Plato Associates, LLC* v. *Environmental Compliance Services, Inc.*, 298 Conn. 852, 862, 9 A.3d 698 (2010).

"The party opposing a motion for summary judgment must present evidence that demonstrates the existence of some disputed factual issue . . . . The movant has the burden of showing the nonexistence of such issues but the evidence thus presented, if otherwise sufficient, is not rebutted by the bald statement that an issue of fact does exist. . . . To oppose a motion for summary judgment successfully, the nonmovant must recite specific facts . . . which contradict those stated in the movant's affidavits and documents. . . . The opposing party to a motion for summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue." (Internal quotation marks omitted.) *Gianetti* v. *Health Net of Connecticut, Inc.*, 116 Conn. App. 459, 464–65, 976 A.2d 23 (2009).

## I

We first turn our attention to the plaintiff's claim that the court improperly ruled that the opinions of the treating physicians, as captured in their medical records, were inadmissible on the issue of causation. The defendant counters that the court determined correctly that the reports were inadmissible because the statements of the treating physicians in their reports were both predicated on hearsay and mere recitations of lay opinions. We agree with the plaintiff.

"[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury." (Internal quotation marks omitted.) *Dimmock* v. *Lawrence & Memorial Hospital, Inc.*, 286 Conn. 789, 813, 945 A.2d 955 (2008). Additionally, "[e]xpert medical opinion evidence is usually required to show the cause of an injury or disease because the

medical effect on the human system of the infliction of injuries is generally not within the sphere of the common knowledge of the lay person." (Internal quotation marks omitted.) *Poulin* v. *Yasner*, 64 Conn. App. 730, 738, 781 A.2d 422, cert. denied, 258 Conn. 911, 782 A.2d 1245 (2001).

In the present case, the court concluded that the treating physicians' medical reports were inadmissible to establish that Leslie's injuries were causally connected to the defendant's care and, therefore, the plaintiff could not put forth any expert testimony to support her claim that the defendant's alleged negligence caused the injuries claimed by the plaintiff. Specifically, in evaluating the plaintiff's claim that the opinions of the treating physicians contained in the medical reports could be introduced in lieu of live testimony, the court noted "that the statements contained in the reports pertaining to causation were either predicated on inadmissible hearsay, as they were made by the patient and her sister or predicated upon the 'expert' opinions of lay witnesses." The court reasoned that "nothing in the records, nor any other evidence," indicated that those individuals who were "advocating a causal connection between [Leslie's] symptoms and her stay at the hospital were qualified to give expert testimony regarding causation." Consequently, the court ruled that the medical records were inadmissible insofar as they pertained to the issue of causation.

The admissibility of medical reports and records created by medical experts is governed by General Statutes § 52-174 (b),[10] which makes clear that a party may intro-

[10] General Statutes § 52-174 (b) provides in relevant part: "In all actions for the recovery of damages for personal injuries or death . . . any party offering in evidence a signed report and bill for treatment of any treating physician . . . may have the report and bill admitted into evidence as a business entry and it shall be presumed that the signature on the report is that of the treating physician . . . . The use of any such report or bill in lieu of the testimony of such treating physician . . . shall not give rise to

duce the reports of treating physicians in lieu of their live expert testimony. See *Shegog* v. *Zabrecky*, 36 Conn. App. 737, 750, 654 A.2d 771, cert. denied, 232 Conn. 922, 656 A.2d 670 (1995). "Whether the trial court improperly admitted evidence under § 52-174 (b) is an evidentiary question, and our review is for abuse of discretion." *Rhode* v. *Milla*, 287 Conn. 731, 742, 949 A.2d 1227 (2008).[11]

"Our Supreme Court has set forth the requirements for a report to be admissible pursuant to § 52-174 (b). [Section 52-174 (b)] permits a signed doctor's report to be admitted as a business entry. . . . [It] creates a presumption that the doctor's signature is genuine and that the report was made in the ordinary course of business. . . . Thus, once the statutory requirement that the report be signed by a treating physician is met, the evidence in that report is admissible and has the same effect as a business entry. . . . This statute serves the purpose of getting medical evidence before the jury in the absence of the treating physician. . . . *Lopiano* v. *Lopiano*, 247 Conn. 356, 383, 752 A.2d 1000 (1998)." (Internal quotation marks omitted.) *Bruneau* v. *Seabrook*, 84 Conn. App. 667, 671, 854 A.2d 818, cert. denied, 271 Conn. 930, 859 A.2d 583 (2004); see also

any adverse inference concerning the testimony or lack of testimony of such treating physician . . . ."

[11] In *DiPietro* v. *Farmington Sports Arena, LLC*, 123 Conn. App. 583, 2 A.3d 963, cert. granted, 299 Conn. 920, 10 A.3d 1053 (2010), this court concluded that, in the course of a summary judgment proceeding, plenary review applies to a trial court's ruling concerning the admissibility of expert testimony. Id., 610–12. Following our decision, the defendant in that case requested and was granted certification to appeal to our Supreme Court on that issue. See *DiPietro* v. *Farmington Sports Arena, LLC*, 299 Conn. 920, 10 A.3d 1053 (2010). We need not decide whether our holding in *DiPietro* applies to this particular case, however, as we conclude that the trial court's ruling was based on a misapprehension of the law and therefore constituted an abuse of discretion. See *Bartel* v. *Bartel*, 98 Conn. App. 706, 713, 911 A.2d 1134 (2006).

*Shegog* v. *Zabrecky*, supra, 36 Conn. App. 737 (signed reports of treating physicians used in lieu of live testimony in medical malpractice action). Accordingly, the plaintiff's attempt to establish causation through the medical reports of Leslie's treating physicians does not present an obstacle to her medical malpractice action.

Furthermore, our case law is clear that a physician's medical opinion is not inadmissible because it is formed, in whole or in part, on the basis of hearsay statements made by a patient. See *George* v. *Ericson*, 250 Conn. 312, 320, 736 A.2d 889 (1999) (although "[i]t is the general rule that an expert's opinion is inadmissible if it is based on hearsay evidence . . . [o]ne exception to this rule . . . is the exception which allows a physician to testify to his opinion even though it is based, *in whole or in part*, on statements made to him by a patient for the purpose of obtaining from him professional medical treatment or advice incidental thereto") [citation omitted; emphasis added; internal quotation marks omitted]). The rationale for this exception is that "the patient's desire to recover his health . . . will restrain him from giving inaccurate statements to a physician employed to advise or treat him." (Internal quotation marks omitted.) *State* v. *Cruz*, 260 Conn. 1, 7, 792 A.2d 823 (2002); see also C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 8.20.2, p. 520 ("[the] exception is based on the theory that persons who consult a doctor for advice or treatment will be motivated by a desire to recover . . . and that such persons will therefore refrain from giving inaccurate statements to the individual advising or treating them"). Accordingly, we conclude that the treating physicians' reliance on statements provided by the patient to establish a temporal basis for their medical conclusions did not render their opinions as to causation inadmissible. See *George* v. *Ericson*, supra, 325 ("fact that an expert opinion is drawn from sources not in themselves

admissible does not render the opinion inadmissible" [internal quotation marks omitted]); *Poulin* v. *Yasner*, supra, 64 Conn. App. 743 (trial court improperly precluded physician's expert testimony that was based in part on statements by injured party).

The defendant also contends that the treatment reports were inadmissible because they embodied little more than mere recitations of Leslie's and the plaintiff's lay opinions on the cause of Leslie's injuries. The defendant presses the argument that, because the reports do not reflect the independent expert opinions of the treating physicians, they are insufficient to establish by expert testimony the evidentiary nexus between the injuries and the defendant's care. We are not persuaded.

Our thorough review of the underlying medical reports reveals that the defendant's proffered interpretation of the opinions of the treating physicians is inconsistent with the level of treatment and evaluation Leslie received while at the Mayo Clinic and the detailed diagnostic conclusions of those who opined on her medical condition. The reports of McEvoy and Josephs demonstrate that, although the plaintiff and her sister reported the anoxic event to McEvoy, this fact is not fatal to the plaintiff's claim. Even if the treating physicians' opinions were based in part on lay statements from Leslie and the plaintiff, their final impressions and diagnosis were formed following comprehensive physical and neurological testing in connection with Leslie's cognitive functioning. For example, after Leslie had been referred to Josephs by McEvoy for an assessment of her cognitive impairments,[12] Josephs "examined [her]

---

[12] The following colloquy took place during the plaintiff's examination of Josephs at his deposition:

"Q. . . . Do you know why Dr. McEvoy wanted a behavioral neurology consultation for Leslie?

"A. Yes.

"Q. Why?

"A. She wanted to know whether the cognitive impairment that the plaintiff and her sister described to her was secondary to [SMS] or something else.

in detail," and administered both cognitive and neurological examinations. After his examinations, Josephs expressly came to his own conclusion concerning Leslie's condition and opined as follows: "*It is my opinion* that [Leslie's] cognitive impairment is secondary to whatever event occurred or whatever transpired in 2002. . . . The cognitive impairment *in my opinion* is not related to the patient's diagnosis [of SMS] and is not in keeping with a neurodegenerative syndrome given the lack of progression." (Emphasis added.) Simply put, this personal assessment by Josephs following his comprehensive testing represents more than a basic recital of the plaintiff's and Leslie's lay opinions regarding causation.

In addition, the treating physicians' medical records reflect that they were aware of Leslie's extensive medical history and the anoxic event that occurred while she was in the care of the defendant before they evaluated her condition. In her "Neurology—Specialty Evaluation" report, McEvoy stated that Leslie had brought detailed outside records in connection with her complex medical history, including an investigative report from the department of health regarding her July, 2002 hospitalization. Although Leslie's 2003 "Dismissal Summary" indicated that specific details of the hospitalization were not available, and that anoxic encephalopathy developed by Leslie's own report of her hospitalization, we conclude that the detailed conclusions of the treating physicians following their extensive testing and evaluation of Leslie in 2005, coupled with the statements of the plaintiff and Leslie to the physicians and the investigative report documenting her hospitalization, were sufficiently reliable to establish that the medical conclusions recorded in the treaters' reports were more than mere recitations of lay opinions. See *George*

"Q. And what was the something else that was under consideration? . . .
"A. Hypoxia."

v. *Ericson,* supra, 250 Conn. 323 (nontreating physician's reliance "on voluminous medical records, including [magnetic resonance images], X rays and hospital records, *as well as the medical history that the plaintiff gave him,* and his own physical examination of [the patient] . . . is hardly material that provides an insufficiently reliable basis for an expert opinion" [emphasis added]).

We conclude, therefore, that the medical reports were improperly precluded on the ground that they were formed exclusively on the basis of unreliable hearsay and nonexpert opinion. Moreover, we conclude that the reports demonstrate that a genuine issue of material fact exists concerning whether the defendant's alleged malpractice is causally connected to Leslie's cognitive injuries.

## II

We now consider two arguments raised by the defendant, essentially as alternate grounds for affirming the court's summary judgment.[13] The defendant contends that the medical reports were inadmissible because (1) the treating physicians did not opine on causation with a reasonable degree of medical probability and (2) the defendant did not have an opportunity to cross-examine them. We address both of these issues in turn.

## A

The defendant claims that the treating physicians' did not express their opinions concerning the cause of Leslie's injuries with a reasonable degree of probability.

[13] Although we recognize that the defendant did not raise these claims in accordance with the strictures of Practice Book § 63-4 (a) (1) (A), it is appropriate for this court to consider the defendant's claims as alternate grounds for affirmance because it raised the claims in its principal brief to this court, affording the plaintiff an adequate opportunity to respond, which she did in her reply brief. See *Gerardi* v. *Bridgeport,* 294 Conn. 461, 466, 985 A.2d 328 (2010).

"To be entitled to damages a plaintiff must establish a causal relation between the injury and the physical condition which he claims resulted from it. . . . This causal connection must rest upon more than surmise or conjecture. . . . A trier is not concerned with possibilities but with reasonable probabilities." (Citations omitted; internal quotation marks omitted.) *Struckman* v. *Burns*, 205 Conn. 542, 554, 534 A.2d 888 (1987). Accordingly, "[e]xpert opinions must be based upon reasonable probabilities rather than mere speculation or conjecture if they are to be admissible in establishing causation." Id., 554–55.

"To be reasonably probable, a conclusion must be more likely than not." Id., 555. "Any expert opinion that describes a 'condition' as possible or merely fifty-fifty is based on pure speculation." *Aspiazu* v. *Orgera*, 205 Conn. 623, 632, 535 A.2d 338 (1987). "An expert, however, need not use 'talismanic words' to show reasonable probability." *Shegog* v. *Zabrecky*, supra, 36 Conn. App. 746. "As long as it is clear that the opinion of the expert is expressed in terms of probabilities, the opinion should be submitted into evidence for a jury's consideration." *Struckman* v. *Burns*, supra, 205 Conn. 555; see also *Mallory* v. *Mallory*, 207 Conn. 48, 54, 539 A.2d 995 (1988) (expert opinion that injuries "most likely" result of abuse expressed in terms of reasonable medical probability); *Hammer* v. *Mount Sinai Hospital*, 25 Conn. App. 702, 720, 596 A.2d 1318 (opinion that injury "might have been caused by a piercing of the subclavian artery" stated with sufficient medical certainty to be considered by jury), cert. denied, 220 Conn. 933, 599 A.2d 384 (1991).

The defendant relies on Josephs' deposition testimony for the proposition that his opinion was not formed on the basis of reasonable medical probability. As set forth previously, at his deposition, Josephs stated during the defendant's examination that he could not

give an opinion as to whether the events that occurred while Leslie was in the defendant's care in July, 2002, caused her alleged injuries. Such testimony, however, is directly at odds with the conclusions that are captured in his medical reports, in which he states clearly that, *in his opinion,* Leslie's "cognitive impairment is secondary to whatever event occurred . . . in 2002." Moreover, during his examination by the plaintiff, Josephs repeated his conclusion from 2005 that Leslie's cognitive defects were the result of the anoxic incident in July, 2002. See footnote 7 of this opinion. Additionally, McEvoy, who was not deposed; see part II B of this opinion; reported in her own "clinical impression" that Leslie was suffering from her SMS, "along with a superimposed anoxic encephalopathy which developed by her report of July 10, 2002 . . . ." McEvoy's clinical impression is reflected in her final evaluation of Leslie in 2005, in which she diagnosed her with SMS and "[c]ognitive impairment (static encephalopathy secondary to anoxic brain damage)."

On the basis of the foregoing, we conclude that the treating physicians' expert opinions as detailed in their medical reports, viewed in the light most favorable to the plaintiff at this stage of the proceedings, as we must, were sufficiently reliable to meet the requisite "reasonable degree of medical probability" standard. See *Aspiazu* v. *Orgera,* supra, 205 Conn. 633. Both McEvoy and Josephs definitively reported that Leslie's cognitive dysfunction was connected to the anoxic event that occurred while she was in the defendant's care. Furthermore, the medical records were created after the treating physicians reviewed the results of a series of physical and neurological tests performed on Leslie and following discussions of her extensive medical history. We are therefore confident that there was sufficient evidence from which a jury reasonably could have determined, without resorting to pure speculation,

that Leslie's injuries were causally connected to the defendant's care. Moreover, to the extent that the defendant raises a dispute between the conclusions expressed in Josephs' medical reports and his deposition testimony, such concerns go to the weight of that evidence, rather than admissibility. See *Eisenbach* v. *Downey*, 45 Conn. App. 165, 176, 694 A.2d 1376, cert. denied, 241 Conn. 926, 696 A.2d 1264 (1997). Accordingly, we cannot affirm the summary judgment on the theory that the treating physicians did not opine on causation with a reasonable degree of medical probability.

B

We turn our attention to the defendant's claim that the medical reports were inadmissible because it was deprived of an opportunity to cross-examine the treating physicians. We are not persuaded.

As set forth previously, the parties experienced difficulty deposing the treating physicians and, consequently, the defendant moved to preclude the plaintiff from introducing their medical reports on the ground that they had not been made available for depositions. The plaintiff, in response, moved the court to obtain a commission for issuance of subpoenas to compel the requested out-of-state depositions of several treating physicians. The court granted the motion as to Josephs and McEvoy,[14] and ordered that their depositions be taken telephonically. Josephs' deposition went forward and, although it lasted only two hours instead of the expected four hours, both sides had an opportunity to inquire into his treatment of Leslie and his corresponding opinions on causation, with counsel for the defendant examining him first. The following day, however,

---

[14] The court refused to order the depositions of the plaintiff's disclosed experts who were nonphysicians, indicating that they were not qualified to opine on causation.

after the plaintiff had issued subpoenas to compel Josephs to complete his deposition and McEvoy to be deposed, counsel for the Mayo Clinic filed a motion for a protective order seeking to preclude the plaintiff from completing Josephs' deposition and from conducting McEvoy's deposition, contending that these depositions constituted an annoyance and were unduly burdensome. The defendant joined in the Mayo Clinic's motion, arguing that neither Josephs nor McEvoy could be compelled to testify. The court, in response to that motion, vacated its previous order and quashed the commissions before McEvoy's deposition.

The defendant contends, in essence, that because it did not have an opportunity to depose and cross-examine McEvoy, her treatment records are inadmissible on the issue of causation. The defendant is correct insofar as it points out that a party generally is entitled to cross-examine any treating physicians whose reports the opposing party seeks to offer pursuant to § 52-174 (b). See *Rhode* v. *Milla*, supra, 287 Conn. 744. In the present case, however, having prompted the court into quashing the subpoenas and blocking McEvoy's deposition, it cannot be granted appellate affirmance on the ground that it was not presented with an opportunity to depose her. "[T]he appellate courts of this state have made it clear that a party cannot take a path at trial and change tactics on appeal." *Moran* v. *Media News Group, Inc.*, 100 Conn. App. 485, 501, 918 A.2d 921 (2007). Accordingly, we conclude that the treatment records are not inadmissible on the ground that the defendant did not have an opportunity to cross-examine the treating physicians.

## III

We turn now to the plaintiff's second claim on appeal, namely, that the court erred in precluding the continued deposition of Josephs and the deposition of McEvoy in

toto.[15] The plaintiff also presses the argument that, in precluding those depositions, the court afforded the treating physicians a testimonial privilege that is not recognized under Connecticut law. We agree with the plaintiff that, under the circumstances of this case, the complete preclusion of McEvoy's deposition was improper.

The plaintiff, in accordance with § 52-174 (b), sought to introduce the medical reports of Josephs and McEvoy as evidence of causation in lieu of their live testimony. Following the defendant's requests to have Josephs and McEvoy deposed and the court's determination that the defendant was entitled to cross-examine them, the plaintiff filed a motion seeking a commission to take their out-of-state depositions by subpoena. The court initially granted the motion, but, following Josephs' two hour deposition, it quashed the commission and vacated its order before McEvoy was deposed. The court reasoned that, on the basis of Josephs' testimony in which he indicated that he did not perceive himself as an expert on causation, the treating physicians could not be compelled to provide expert testimony on the issue of causation. The court also noted that it was appropriate to intervene in the discovery proceedings to ensure that they were fair and not being abused.

"We have long recognized that the granting or denial of a discovery request rests in the sound discretion of the [trial] court, and is subject to reversal only if such an order constitutes an abuse of that discretion." (Internal quotation marks omitted.) *Barry* v. *Quality Steel Products, Inc.*, 280 Conn. 1, 16–17, 905 A.2d 55 (2006); see also *Lougee* v. *Grinnell*, 216 Conn. 483, 491, 582 A.2d 456 (1990) (ruling on motion to quash deposition subpoena

---

[15] We address this issue because it is likely to arise on remand, and the claim properly was raised and argued before us. See *Travelers Property & Casualty Co.* v. *Christie*, 99 Conn. App. 747, 763 n.12, 916 A.2d 114 (2007).

reviewed for abuse of discretion), overruled in part on other grounds by *State* v. *Salmon*, 250 Conn. 147, 154–55, 735 A.2d 333 (1999) (en banc). "That discretion is limited, however, by the provisions of the rules pertaining to discovery . . . especially the mandatory provision that discovery *shall* be permitted if the disclosure sought would be of assistance in the prosecution or defense of the action." (Citation omitted; emphasis in original; internal quotation marks omitted.) *Standard Tallow Corp.* v. *Jowdy*, 190 Conn. 48, 57–59, 459 A.2d 503 (1983).

On the basis of the proceedings, and in light of our Supreme Court's decision in *Rhode* v. *Milla*, supra, 287 Conn. 731, it is our view that the court abused its discretion in precluding the deposition of McEvoy. During the proceedings, the court made it clear, after granting the plaintiff's motion for the appointment of a commission, that if Josephs and McEvoy "did not testify adequately at deposition to support the basis of their purported opinions on causation," their medical reports would be inadmissible on the issue of causation. The court, however, did not give the plaintiff an opportunity to acquiesce to its demands because in quashing the commission following Josephs' deposition it effectively precluded the taking of McEvoy's deposition. In so doing, the court deprived the plaintiff of a chance to seek the expert testimony that it had already declared essential to the plaintiff's evidentiary burden on the issue of causation. See *Standard Tallow Corp.* v. *Jowdy*, supra, 190 Conn. 60 (abuse of discretion to preclude plaintiff from discovering information that court "had already recognized . . . was necessary").

Our Supreme Court's decision in *Rhode* v. *Milla*, supra, 287 Conn. 731, also lends support to our conclusion that the court improperly precluded McEvoy's deposition. In *Rhode*, the plaintiff sought to introduce certain medical bills pursuant to § 52-174 (b) in lieu of

live testimony from her expert. Id., 734. At the expert's deposition, he refused to answer any questions that were posed to him by invoking his fifth amendment privilege against self-incrimination.[16] Id. The defendant claimed, and our Supreme Court agreed, that the bills were inadmissible pursuant to § 52-174 (b) because the defendant did not have any opportunity to cross-examine the expert in a meaningful manner concerning those medical bills. Id., 744.

Essentially, *Rhode* stands for the proposition that the opportunity to cross-examine an expert is a necessary procedural predicate to the admissibility of reports and records pursuant to § 52-174 (b). Naturally, therefore, it would be improper for a court to refuse to permit adequate direct examination of such an expert, as such preclusion would provide the opposing party with a secure path for challenging the admissibility of those materials on the ground that it was denied its right to cross-examination.[17] Accordingly, in the situation where a party seeks to offer an expert's reports or records into evidence pursuant to § 52-174 (b), it would be improper for the court to assist in precluding the deposition of that expert. We conclude, therefore, that the court abused its discretion in vacating the commission to take the deposition of McEvoy.

In so concluding, we are cognizant that, as in *Rhode*, a deponent properly may refuse to testify on the ground of an applicable testimonial privilege. We take this opportunity to address the plaintiff's claim that the court's ruling that precluded McEvoy's deposition was based, in part, on its erroneous conclusion that the

---

[16] The expert had become the subject of a federal criminal investigation into his billing practices. *Rhode* v. *Milla*, supra, 287 Conn. 734.

[17] Although the defendant raises just such a claim as an alternate ground to affirm the court's summary judgment, we reject that claim insofar as the court's ruling precluding McEvoy's deposition was prompted by the defendant. See part II B of this opinion.

treating physicians enjoyed a testimonial privilege against being compelled to testify as causation witnesses. In response to that claim, the defendant contends that the treating physicians enjoyed an absolute privilege not to be pressed into service as experts for the plaintiff. For the reasons that follow, we disagree with the defendant.

First, to the extent that such a rule would give the subpoenaed expert witnesses in this case the right to refuse to attend a deposition, we fail to see how the defendant has any standing to assert the witnesses' rights. Even if we were to assume, arguendo, that there was such a privilege, it would be personal to the witnesses and not within the scope of any party's rights to assert.

Second, insofar as the defendant requests that we craft a testimonial privilege that would permit a qualified person to refuse to testify as an expert witness, even if that person was familiar with the relevant underlying facts that gave rise to the litigation; see, e.g., *Ondis* v. *Pion*, 497 A.2d 13, 18 (R.I. 1985) (compelling experts to testify "would in essence involve a form of involuntary servitude that should normally not be inflicted upon a person merely because of his professional expertise"); we note that such a rule finds no support in our appellate jurisprudence or our long history of trial practice. Moreover, a categorical rule permitting treating physicians to refuse to testify at a deposition is not in harmony with our liberal discovery rules, which explain that "[e]vidence may be elicited at a discovery deposition even though 'the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.' Practice Book § [13-2]." *Sanderson* v. *Steve Snyder Enterprises, Inc.*, 196 Conn. 134, 139, 491 A.2d 389 (1985).

Finally, the idea that an expert witness who already has expressed an opinion in connection with the material facts of a case cannot be called to testify as to the basis for such opinion is inconsistent "with the very nature of a trial as a search for truth"; *Nix* v. *Whiteside*, 475 U.S. 157, 166, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986); and in stark contrast to the "fundamental maxim that the public . . . has a right to every man's evidence." (Internal quotation marks omitted.) *Jaffee* v. *Redmond*, 518 U.S. 1, 9, 116 S. Ct. 1923, 135 L. Ed. 2d 337 (1996). For this reason, the United States Supreme Court has cautioned that evidentiary privileges "are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States* v. *Nixon*, 418 U.S. 683, 710, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974); see also *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 330, 838 A.2d 135 (2004) (testimonial privilege " 'tends to prevent a full disclosure of the truth in court' "); *Kaufman* v. *Edelstein*, 539 F.2d 811, 820 (2d Cir. 1976) ("we perceive no sufficient basis in principle or precedent for holding that the common law recognizes any general privilege to withhold . . . expert knowledge"); 8 J. Wigmore, Evidence (McNaughton Rev. 1961) § 2192, p. 70 ("we start with the primary assumption that there is a general duty to give what testimony one is capable of giving and that any exemptions which may exist are distinctly exceptional"). Although we do not hold that a person may be compelled to offer expert testimony in a case simply because he is an expert in a particular field; see *In re American Tobacco Co.*, 880 F.2d 1520, 1527 (2d Cir. 1989); *Statutory Committee of Unsecured Creditors* v. *Motorola, Inc.*, 218 F.R.D. 325, 326 (D.D.C. 2003); that does not mean that a treating physician cannot be compelled to testify at a deposition as to opinions documented in his medical records and the statements made therein. In this connection, we emphasize that both

Josephs and McEvoy were disclosed as experts by the plaintiff because, during the course of their care as treating physicians, each offered a tangible opinion as to the causal connection between the defendant's alleged negligence and Leslie's injuries. Because "[t]here is no justification for a rule that would wholly exempt experts from placing before a tribunal factual knowledge relating to the case in hand [*or*] *opinions already formulated*"; (emphasis added; internal quotation marks omitted) *Lane* v. *Stewart*, 46 Conn. App. 172, 176, 698 A.2d 929, cert. denied, 243 Conn. 940, 702 A.2d 645 (1997); we decline to accept the defendant's invitation to create a testimonial privilege that would prevent such witnesses from being deposed in the present case.[18]

The judgment is reversed and the case is remanded with direction to deny the defendant's motion for summary judgment and for further proceedings according to law.

In this opinion the other judges concurred.

[18] We do not address, because we need not do so, whether if such a deposition witness were to demand payment for his or her appearance, the court could award such a payment by the party issuing the subpoena.