******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

DOROTHY WEAVER, COADMINISTRATOR (ESTATE
OF DEMARIUS DOUGLAS WEAVER), ET AL.
*v.* CRAIG MCKNIGHT ET AL.
(SC 18974)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Vertefeuille, Js.

*Argued January 16—officially released September 2, 2014*

*D. Lincoln Woodard*, for the appellants (plaintiffs).

*Laura Pascale Zaino*, with whom, on the brief, was *Thomas W. Boyce, Jr.*, for the appellees (defendant Henry Amdur et al.).

*Opinion*

ROGERS, C. J. This appeal arises from the stillbirth of Demarius Douglas Weaver (decedent). The plaintiffs, Dorothy Weaver and Fred Weaver, as coadministrators of the estate of the decedent, and Dorothy Weaver (Weaver), individually, brought an action against the defendants Henry Amdur and Thames Gynecological Group, P.C.,[1] claiming, among other things, that Amdur's negligent failure to diagnose and treat Weaver's gestational diabetes caused the decedent's stillbirth, a claim the defendants dispute.

The dispositive issue in this appeal is whether the trial court properly precluded two of the plaintiffs' expert witnesses, physicians board certified in obstetrics and gynecology, from testifying to their opinion that Weaver's untreated gestational diabetes caused the decedent's stillbirth. The trial court precluded the experts' respective opinions on the grounds that neither witness had any training or experience in determining cause of death and were not board certified in pathology. The preclusion of these causation opinions led to a directed verdict and judgment in favor of the defendants. The plaintiffs appealed from the trial court's judgment to the Appellate Court, which affirmed the judgment. *Weaver* v. *McKnight*, 134 Conn. App. 652, 658, 40 A.3d 786 (2012). We granted the plaintiffs' petition for certification, limited to the following question: "Did the Appellate Court properly conclude that the trial court did not abuse its discretion in precluding testimony by the plaintiffs' two experts, both of whom are board certified in obstetrics and gynecology?" *Weaver* v. *McKnight*, 305 Conn. 907, 44 A.3d 183 (2012).

We conclude that the trial court's decision to preclude the expert testimony contradicted the facts in the record and applicable law, thus amounting to an abuse of discretion. Accordingly, we reverse the Appellate Court's judgment with direction to reverse the trial court's judgment and to remand the case for a new trial.

Furthermore, we also review certain evidentiary rulings of the trial court that are likely to arise again on remand; see Practice Book § 84-11; namely, whether the trial court properly: (1) precluded a treating physician from testifying about his opinion that Weaver had developed gestational diabetes in the later stages of her pregnancy; (2) precluded a treating nurse from testifying to her suspicion that Weaver had gestational diabetes and her concerns about the treatment given by Amdur; and (3) permitted the defendants to cross-examine one of the plaintiffs' expert witnesses about a censure issued to him by a voluntary membership professional organization. We conclude that the trial court abused its discretion in precluding the opinion from the treating physician and in allowing the cross-examination about the censure, but we sustain the trial

court's ruling precluding certain testimony of the treating nurse.

## I

We begin with the relevant facts in the record. Weaver, the decedent's mother, received prenatal treatment from the defendants at Lawrence and Memorial Hospital (hospital). Five days before the stillbirth of the decedent, Weaver went in for a weekly visit and was seen by Nancy Hess, an advanced practice registered nurse. Hess detected a fetal heart rate and fetal movement. Weaver also underwent an ultrasound examination to take measurements of the fetus' size and weight. The next day, four days before the stillbirth, Hess reviewed the ultrasound results. The ultrasound showed a large fetus weighing more than eleven pounds. Because of the size of the fetus, and Hess' knowledge of test results showing that Weaver had elevated blood sugar levels, Hess was concerned that Weaver might have uncontrolled high blood sugar levels as a result of gestational diabetes. Hess contacted the treating physician, Amdur, that same day and told him of the fetus' weight, which was larger than expected for his gestational age of approximately thirty-eight weeks. Hess also told Amdur certain facts about Weaver, namely that she was thirty-five years old, she previously had given birth to another child weighing about nine pounds, and she had tested positive for the presence of sugar in her urine during the last three checkups. Amdur determined that the fetus was "macrosomic," a medical term for a large baby; see Stedman's Medical Dictionary (28th Ed. 2006) p. 1142 (defining "macrosomia" as "[a]bnormally large size of the body"); and told Hess that Weaver should be offered a scheduled cesarean section to deliver the fetus the following week. Amdur did not order any further tests.

Weaver went in for a scheduled cesarean section four days later, on Tuesday, May 16, 2006. The admitting nurse and an attending physician, Craig McKnight, however, were unable to detect a fetal heart rate during a preoperative ultrasound. McKnight confirmed the result with a radiologist and then informed Weaver of the loss of the baby. McKnight also ordered several tests to help determine the cause of the stillbirth, including tests to analyze Weaver's blood sugar levels. McKnight delivered the decedent by cesarean section. Within one day after the delivery, and after reviewing test results, McKnight formed an opinion that Weaver had gestational diabetes and told Weaver that it appeared that she had developed poor blood sugar control in the later stages of her pregnancy.

A pathologist later performed an autopsy of the decedent and the placenta. The pathologist ruled out several possible causes of the stillbirth, including birth defects and infection, but was unable to determine an anatomic cause of death based on her pathological examination.

The pathologist later testified during a deposition that she had no opinion about whether gestational diabetes played a role in the stillbirth. She also testified, however, that she would not have been able to see evidence of poor blood sugar control in an autopsy, and she did not know the mother's or the decedent's blood sugar levels. According to the pathologist, determining whether a mother suffered from poor sugar control is more of "a clinical assessment rather than a pathological assessment."

The plaintiffs later filed this action against the defendants for the loss of the decedent and harm to Weaver. According to the plaintiffs, Amdur should have known from Weaver's test results and the abnormally large size of the fetus that Weaver suffered from uncontrolled gestational diabetes, which created an increased risk of stillbirth. The plaintiffs principally claimed in their amended complaint that Amdur's failure to diagnose and treat Weaver's gestational diabetes caused the decedent's stillbirth. The defendants disputed the plaintiffs' claims that Weaver had gestational diabetes or that Amdur's actions contributed to the stillbirth.

At trial, the plaintiffs offered the testimony of Russell Jelsema, a physician and board certified obstetrician and gynecologist, to establish the cause of the stillbirth. Jelsema testified that he specializes in maternal-fetal medicine, which focuses on the care of the mother and fetus in the womb, and has been a practicing physician since 1990. He completed a four year residency in obstetrics and gynecology and a two year fellowship specializing in the treatment of women with complicated pregnancies. According to his curriculum vitae, Jelsema has authored more than two dozen publications, including peer reviewed articles, abstracts, and book chapters, principally related to obstetrics and gynecology. He currently maintains his own practice with several hospitals, sees patients on consultation from other physicians, and also teaches medical students and residents. Jelsema testified that approximately 25 percent of his patients have pregnancies complicated by diabetes. Jelsema further testified that he has been involved with the delivery of hundreds of stillborn infants. As part of his practice, he routinely reviews information, including autopsy, laboratory, and clinical reports, to try to determine the cause of the stillbirths and then explains his opinion about the cause to the parents of the stillborn infant.

At trial, the plaintiffs offered Jelsema to opine that Weaver had untreated gestational diabetes and that Amdur's failure to diagnose and treat this condition caused the decedent's stillbirth. Jelsema testified that, in his opinion, Weaver had uncontrolled gestational diabetes, a condition that created an increased risk of a stillbirth. According to Jelsema, when a mother has untreated diabetes, the mother's insufficient insulin lev-

els prevent her body from transferring blood sugar to her cells, leaving an abnormally high level of sugar remaining in the mother's blood. This excess sugar is then transferred to the fetus' blood through the placenta. The fetus, which has normal insulin function, then absorbs an abnormally high amount of blood sugar, causing the fetus to grow unusually large. According to Jelsema, the current understanding in the medical field is that the increased level of blood sugar causes acid to build up in the fetus' veins, which can eventually lead to its death. Jelsema testified that, even in the absence of a pathologist's determination of an anatomical cause of death, he can determine cause of death from gestational diabetes by reviewing the autopsy reports along with information not reviewed by the pathologist, including the mother's clinical and blood sugar reports, and by excluding other possible causes of death. The plaintiffs asked Jelsema at trial whether, based on his review of the evidence, he had an opinion about whether Weaver's untreated gestational diabetes caused or substantially contributed to the decedent's stillbirth.

The defendants, who previously had filed a motion in limine to preclude this causation testimony, objected to the plaintiffs' offer for two reasons. First, the defendants argued that Jelsema lacked the requisite training and experience to testify about cause of death. The defendants observed that Jelsema was not a pathologist and that the pathologist that examined the decedent could not determine an anatomical cause of death. The defendants further noted that during his deposition, Jelsema was unable to testify knowledgeably about certain fetal conditions that the defendants contended may have caused the decedent's stillbirth. Second, the defendants asserted that the plaintiffs did not offer enough evidence to provide a factual foundation for Jelsema's opinion that the gestational diabetes actually caused the decedent's stillbirth in this case.

After hearing argument by counsel, the trial court precluded Jelsema's causation opinion testimony. The record reveals two grounds for the trial court's decision. First, the trial court determined that Jelsema lacked experience in determining cause of death: "Here the matter specifically in issue for this question is the cause of death. And the witness has testified that he's written a lot about diabetes. He's studied a lot about diabetes. He teaches about different things, but he's never—he hasn't testified that he has any experience at all in determining the cause of death." Second, the trial court—relying on our decision in *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 159, 971 A.2d 676 (2009), in which we noted that an " 'expert's knowledge or experience must be directly applicable to the matter specifically in issue' "—apparently determined that only a pathologist could testify about cause of death. During argument on the defendants' objection,

the trial court, citing *Sullivan,* asked the plaintiffs' counsel if he could cite to "any cases suggesting that a [physician] other than a pathologist can render an opinion on the cause of death" and gave counsel the lunch recess to find such a case. After the recess, the plaintiffs' counsel cited *Marshall* v. *Hartford Hospital,* 65 Conn. App. 738, 758, 783 A.2d 1085 (2001), in which the Appellate Court concluded that a medical practitioner's relevant experience and training, not the "artificial classification" of the witness' medical specialty, should govern the qualification inquiry. Nevertheless, the trial court precluded Jelsema's opinion testimony.

The plaintiffs then offered the testimony of another proposed expert witness, Frank Bottiglieri, also a physician board certified in the practice of obstetrics and gynecology, on the issue of causation. Bottiglieri has practiced medicine for more than twenty years, and his practice includes treatment of patients with high risk pregnancies, including those impacted by gestational diabetes. Bottiglieri testified that part of his practice includes managing patients who have stillbirths, including those involving gestational diabetes, and that, in the course of this practice, he reviews autopsy reports and other clinical information to determine the cause of the stillbirth. Bottiglieri also explained that untreated gestational diabetes can cause a stillbirth. The plaintiffs offered Bottiglieri's opinion that Weaver's untreated gestational diabetes was a substantial factor in the decedent's stillbirth.

The defendants objected to the offer of Bottiglieri's opinions for the same reasons supporting their objection to the offer of Jelsema's opinion.

The trial court precluded Bottiglieri's testimony, citing again to the requirement that an " 'expert's knowledge or experience must be directly applicable to the matter specifically in issue' " set forth in *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 292 Conn. 159. The trial court explained: "I'm going to grant the motion to preclude based on my determination that, while the witness is very qualified to offer evidence with regard to the standard of care, the qualifications indicated by the examination do not rise to the level of meeting the hurdle as placed by the directly applicable language [in *Sullivan*] as it relates to time and cause of death."

Because the trial court precluded the plaintiffs' experts from testifying about causation, and the plaintiffs had no other causation evidence sufficient to establish their claims, the trial court granted a motion by the defendants for a directed verdict at the close of the plaintiffs' evidence. The trial court then rendered judgment for the defendants.

The plaintiffs' appealed from that judgment to the Appellate Court, which affirmed the trial court's judg-

ment. The Appellate Court upheld the trial court's decision to preclude the plaintiffs' causation experts for two reasons. *Weaver* v. *McKnight*, supra, 134 Conn. App. 665–68. First, the Appellate Court agreed that there was no evidence that Jelsema and Bottiglieri were qualified based on their training or experience to render an opinion on cause of death. Id. Second, the Appellate Court analyzed the "scientific validity" of their respective opinions, relying on a case employing the analysis set forth in *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), for assessing the validity of scientific methods used to support an expert's opinion. *Weaver* v. *McKnight*, supra, 665–68. The Appellate Court determined that "[a]lthough [Jelsema and Bottiglieri each] indicated that [they] could determine cause of death even though a pathologist could not, the plaintiffs failed to produce any evidence indicating the validity of that medical opinion." Id., 668. This certified appeal followed.

II

The plaintiffs principally claim on appeal that the trial court improperly precluded Jelsema's and Bottiglieri's causation testimony. The plaintiffs assert that the record shows that each of the witnesses has substantial experience with the topic at issue, the cause of stillbirth, and had ample factual support for their opinions that Weaver's gestational diabetes caused the decedent's stillbirth. The plaintiffs further argue that the trial court's decision to preclude the challenged testimony rested on an untenable reading of the record that ignored the witnesses' testimony about their relevant experience and, furthermore, that the trial court incorrectly determined that the witnesses could not testify about the cause of stillbirth because they were not pathologists. The defendants respond by conceding that whether the witnesses were pathologists is not dispositive of the qualification inquiry. Rather, the defendants argue that the trial court properly precluded the witnesses' causation opinions because the witnesses were not sufficiently familiar with certain concepts relating to stillbirth and pathology. The defendants also contend that the plaintiffs did not provide any independent facts to support the witnesses' opinions, and, therefore, their opinions did not amount to anything more than speculation or conjecture. We agree with the plaintiffs.

We begin with our standard of review. We review a trial court's decision to preclude expert testimony for an abuse of discretion. See, e.g., *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 292 Conn. 157–58. We afford our trial courts wide discretion in determining whether to admit expert testimony and, unless the trial court's decision is unreasonable, made on "untenable grounds"; *Hammond* v. *Bridgeport*, 139 Conn. App. 687, 701, 58 A.3d 259 (2012); or involves "a clear misconcep-

tion of the law," we will not disturb its decision. (Internal quotation marks omitted.) *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 157. Although we afford trial courts significant discretion, "[w]here it clearly appears that an expert witness is qualified to give an opinion, the exclusion of his testimony may be found to be [an abuse of discretion]." See, e.g., *Wray* v. *Fairfield Amusement Co.*, 126 Conn. 221, 224, 10 A.2d 600 (1940); see also *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 157–58. To the extent the trial court makes factual findings to support its decision, we will accept those findings unless they are clearly improper. *Fisher* v. *Big Y Foods, Inc.*, 298 Conn. 414, 423, 3 A.3d 919 (2010). If we determine that a court acted improperly with respect to the admissibility of expert testimony, we will reverse the trial court's judgment and grant a new trial only if the impropriety was harmful to the appealing party. *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 158.

We also note our standards for admitting expert testimony. "Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . [T]o render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion." (Citations omitted; footnote omitted; internal quotation marks omitted.) Id.

The Appellate Court affirmed the trial court's preclusion of Jelsema's and Bottiglieri's causation testimony on two separate grounds: (1) the witnesses lacked specialized knowledge or experience on the issue of cause of death that would be helpful to a fact finder; and (2) the plaintiffs did not present any evidence to support the scientific validity of the witnesses' methods for determining cause of death when a pathologist was unable to determine a cause. *Weaver* v. *McKnight*, supra, 134 Conn. App. 665–68. We disagree with both conclusions.

A

The Appellate Court concluded that the trial court properly found that neither Jelsema nor Bottiglieri had any relevant experience in determining the cause of the stillbirth and therefore were not qualified to testify about that topic. Id. The evidence in the record, however, refutes this conclusion and, instead, shows that the plaintiffs established each of the requirements necessary for admitting their experts' respective opinions on the cause of the stillbirth in this case. We address each requirement in turn.

1

As for the first requirement, the trial court's finding that Jelsema and Bottiglieri lacked any experience in

determining the cause of the stillbirth was clearly improper. Both experts, through their experience as obstetricians and gynecologists, had substantial knowledge and experience directly relevant to determining the cause of stillbirth. Jelsema testified that he was a board certified obstetrician and gynecologist, with a specialty in maternal-fetal medicine, and had experience in treating pregnancies complicated by diabetes. He further testified that, as part of his practice, he had been involved in "hundreds" of deliveries of stillborn infants. When treating a patient who gives birth to a deceased infant, part of his routine care includes determining the cause of the stillbirth. According to Jelsema's testimony, in such instances, he regularly reviews autopsy reports, laboratory results, and clinical information to identify a cause. Bottiglieri testified to having similar experience in his practice. Bottliglieri also delivers stillborn infants and routinely reviews autopsy reports and other clinical and laboratory reports to determine the cause. These stillbirths have included infants stillborn to diabetic mothers. The witnesses' respective experiences in determining the cause of a stillbirth are " 'directly applicable' "; *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 292 Conn. 159; to a matter at issue in the case, namely, whether the defendants' failure to diagnose and treat Weaver's gestational diabetes caused the decedent's stillbirth. The trial court's finding to the contrary, that neither Jelsema nor Bottiglieri had any experience determining the cause of stillbirth, flatly contradicts the record and, thus, is clearly incorrect. The Appellate Court therefore improperly relied on this finding to reach its decision.[2]

The defendant argues, however, that "critical limitations" in Jelsema's and Bottiglieri's level of expertise rendered them unqualified to testify. The defendants assert that Jelsema and Bottiglieri cannot testify about the cause of stillbirth because they both deferred to pathologists on certain questions posed to them during their depositions. For instance, the defendants claim that Jelsema admitted during his deposition that "pathologists are 'more expert' when it comes to information related to the cause of fetal death" and that both Jelsema and Bottiglieri were unable to fully testify to the defendants' satisfaction about the nature of a rare fetal disorder called Beckwith-Wiedeman Syndrome. Even if we were to assume that these criticisms are true, we disagree that they render the testimony inadmissible.

The defendants' criticisms go to the weight of the witnesses' testimony, not to its admissibility. "[I]f any reasonable qualifications can be established, the objection goes to the weight rather than to the admissibility of the evidence." (Internal quotation marks omitted.) *State* v. *Palmer*, 196 Conn. 157, 167, 491 A.2d 1075 (1985); *Campbell* v. *Pommier*, 5 Conn. App. 29, 37–38, 496 A.2d 975 (1985). An expert need not know *every-*

*thing* about a topic to be an expert in that field. See, e.g., *Mannino* v. *International Mfg. Co.*, 650 F.2d 846, 850 (6th Cir. 1981) ("[T]he expert need not have complete knowledge about the field in question, and need not be certain. He need only be able to aid the jury in resolving a relevant issue."); *State* v. *Davis*, 116 Ohio St. 3d 404, 426, 880 N.E.2d 31 (2008) (same); *Novitski* v. *Rusak*, 941 A.2d 43, 49 (Pa. Super. 2008) (same); see also *Campbell* v. *Pommier*, supra, 37–38 (trial court improperly precluded expert with sufficient but "skimpy" credentials because witness' depth of knowledge goes to weight of testimony). In addition, an expert need not be the best or most qualified witness for his testimony to be admissible. See, e.g., *Davis* v. *Margolis*, 215 Conn. 408, 413–17, 576 A.2d 489 (1990) (whether another expert is more qualified does not affect admissibility inquiry); see also *Pineda* v. *Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) ("[i]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate" [internal quotation marks omitted]). Here, the plaintiffs established Jelsema's and Bottiglieri's " 'reasonable qualifications' " based on their practical experience. See *State* v. *Palmer*, supra, 167. In light of the witnesses' qualifications, the defendants' concerns are a proper subject for cross-examination, but do not render their testimony inadmissible. *Milliun* v. *New Milford Hospital*, 310 Conn. 711, 733, 80 A.3d 887 (2013) ("[a]lthough there may be other possible causes that the physicians did not consider, such matters go to weight, not admissibility" of their opinions).

### 2

Turning to the second requirement for admitting expert testimony, Jelsema's and Bottiglieri's respective knowledge and experience about the causes of stillbirth are not common to a layperson. The parties do not dispute that the cause of stillbirth is not a matter of common knowledge or experience, and thus requires expert testimony. See *Collette* v. *Collette*, 177 Conn. 465, 471, 418 A.2d 891 (1979) (expert testimony required to establish cause of miscarriage); see also *Aspiazu* v. *Orgera*, 205 Conn. 623, 631, 535 A.2d 338 (1987) ("[t]he medical effect upon the human system of the infliction of injuries, is generally not within the sphere of the common knowledge of a lay witness" [internal quotation marks omitted]).

### 3

As for the third requirement, Jelsema's and Bottiglieri's causation opinion testimony would help the jury in resolving the causation issues in the case. To be helpful, an expert's opinion testimony must aid the fact finder in resolving an issue in the case and have some basis in fact. See *Sullivan* v. *Metro-North Commuter*

*Railroad Co.*, supra, 292 Conn. 158. An expert's opinion may not be based on surmise or conjecture. *State* v. *Nunes*, 260 Conn. 649, 672–74, 800 A.2d 1160 (2002); see also *Gordon* v. *Glass*, 66 Conn. App. 852, 856, 785 A.2d 1220 (2001) ("[t]he expert opinion cannot rest on surmise or conjecture because the trier of fact must determine probable cause, not possible cause" [internal quotation marks omitted]), cert. denied, 252 Conn. 909, 789 A.2d 994 (2002). Although "[s]ome facts must be shown as the foundation for an expert's opinion . . . there is no rule of law declaring the precise facts which must be proved before such an opinion may be received in evidence. . . . Where the factual basis of an expert opinion is challenged, therefore, the question before the court is whether the uncertainties in the essential facts on which the opinion is predicated are such as to make an opinion based on them without substantial value." (Citation omitted; internal quotation marks omitted.) *State* v. *John*, 210 Conn. 652, 677, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989).

In this case, the parties do not dispute that Jelsema's and Bottiglieri's opinion testimony related directly to causation, that is, whether Weaver's gestational diabetes, and Amdur's failure to diagnose and treat this condition, caused the decedent's stillbirth, a necessary part of the plaintiffs' medical malpractice claim. See *Aspiazu* v. *Orgera*, supra, 205 Conn. 630 (plaintiff in medical malpractice case must prove that defendant's negligence caused plaintiff's harm).

The defendants claim, however, that the plaintiffs failed to provide a factual basis for the witnesses' causation opinions, rendering them nothing more than surmise or conjecture. We disagree. The plaintiffs' evidence presented at trial, if credited by a fact finder, established the following: Weaver's blood sugar levels and the size of the decedent at the time of delivery demonstrate that she suffered from undiagnosed late term gestational diabetes that was poorly controlled; mothers with gestational diabetes are at greater risk for stillbirth; the risk of stillbirth increases when the mother's gestational diabetes is undetected or poorly controlled; the decedent's uncommonly large size at the time of birth—more than eleven pounds—indicated that the decedent was exposed to high levels of blood sugar; and the current medical understanding is that high blood sugar results in increased acid levels in the fetus' bloodstream, which can become progressive and cause death. The plaintiffs' evidence, if credited, also supported the elimination of other possible causes of the stillbirth besides gestational diabetes, including genetic defects, physical abnormalities, and infection.

Taken together, these facts provided an ample factual basis for the witnesses' respective causation opinions. See *George* v. *Ericson*, 250 Conn. 312, 321–24, 736 A.2d

889 (1999) (nontreating physician may base opinion on medical records, test results, laboratory reports, and party's statements); *Aspiazu* v. *Orgera*, supra, 205 Conn. 631 (causal relation between injury and its later physical effects may be established "by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency" [internal quotation marks omitted]). The defendants contest the validity of these facts and the witnesses' conclusions drawn from them, but those concerns are properly tested on cross-examination and through the defendants' presentation of evidence. They do not render the challenged testimony inadmissible. See *State* v. *John*, supra, 210 Conn. 677 (conflicting evidence goes to weight of opinion).

On the basis of these factors, Jelsema and Bottiglieri were clearly qualified to render an opinion on the cause of the decedent's stillbirth. Although we give our trial courts wide discretion in ruling on the admissibility of expert testimony, we will reverse a trial court's decision when it is based on untenable grounds or when the expert's qualifications are clear. See, e.g., *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 292 Conn. 157–58, 160–61. Here, the trial court's decision rested on a clearly incorrect reading of the record, which amply established the witnesses' qualifications. Consequently, we conclude that the Appellate Court's decision to affirm the trial court's exercise of its discretion in denying the testimony of Jelsema and Bottiglieri was improper.

B

We next turn to the Appellate Court's decision to uphold the trial court's ruling on the alternative basis that the plaintiffs did not establish the scientific validity of the methods used by the witnesses to reach their opinions. In reaching its decision on this basis, the Appellate Court conflated the test to determine whether a witness is qualified to give an opinion; see part II A of this opinion; with a *Porter* analysis, which assesses the validity of the methods that an expert used to reach his conclusions. *Weaver* v. *McKnight*, supra, 134 Conn. App. 665–68. Although the defendants challenged the witnesses' training and experience on the topic of the cause of stillbirth, the defendants did not challenge the validity of the scientific method that the witnesses used to reach their causation opinions. Accordingly, we conclude that the Appellate Court's decision based on a *Porter* claim, which was not raised in the trial court, was improper.

The Appellate Court relied on our decision in *Klein* v. *Norwalk Hospital*, 299 Conn. 241, 9 A.3d 364 (2010), a case applying a *Porter* analysis. The Appellate Court was concerned with the scientific validity of Jelsema's and Bottiglieri's testimony that they could determine that gestational diabetes was a substantial factor in

causing the decedent's stillbirth even when a pathologist could not. According to the Appellate Court, "with respect to the . . . cases where Jelsema indicated that he had determined the cause of death when a pathologist could not, there was no evidence regarding the scientific validity of that opinion." *Weaver* v. *McKnight*, supra, 134 Conn. App. 666. The Appellate Court reached the same conclusion for Bottiglieri's testimony, explaining that "[a]lthough [Bottiglieri] indicated that he could determine a cause of death even though a pathologist could not, the plaintiffs failed to produce any evidence indicating the validity of that medical opinion." Id., 668. According to the Appellate Court, nothing supported these opinions except the unsupported assertions of the witnesses, which the court found insufficient to establish the validity of their claims that they could determine cause of death despite an inconclusive determination by a pathologist. Id., citing *Klein* v. *Norwalk Hospital*, supra, 263.

In *Porter*, we followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that testimony based on scientific evidence should be subjected to a flexible test to determine the reliability of methods used to reach a particular conclusion. *State* v. *Porter*, supra, 241 Conn. 61–66. A *Porter* analysis involves a two part inquiry that assesses the reliability and relevance of the witness' methods. Id., 63–64. First, the party offering the expert testimony must show that the expert's methods for reaching his conclusion are reliable. A nonexhaustive list of factors for the court to consider include: "general acceptance in the relevant scientific community; whether the methodology underlying the scientific evidence has been tested and subjected to peer review; the known or potential rate of error; the prestige and background of the expert witness supporting the evidence; the extent to which the technique at issue relies [on] subjective judgments made by the expert rather than on objectively verifiable criteria; whether the expert can present and explain the data and methodology underlying the testimony in a manner that assists the jury in drawing conclusions therefrom; and whether the technique or methodology was developed solely for purposes of litigation." (Internal quotation marks omitted.) *State* v. *Guilbert*, 306 Conn. 218, 231–32, 49 A.3d 705 (2012). Second, "the proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. . . . Put another way, the proponent of scientific evidence must establish that the specific scientific testimony at issue is, in fact, derived from and based [on] . . . [scientifically reliable] methodology." (Internal quotation marks omitted.) Id., 232.

We take this opportunity to stress that a *Porter* analysis is separate from our test used to determine whether

a witness is qualified to give expert testimony. As discussed in part II A of this opinion, all expert witnesses must be qualified to present expert testimony on a particular subject. To establish qualifications, the party presenting an expert witness must show that the witness has special knowledge or skills, not common to the average person, that would be helpful to the fact finder in resolving an issue in the case. See, e.g., *State v. Kemp*, 199 Conn. 473, 476, 507 A.2d 1387 (1986), overruled in part on other grounds by *State v. Guilbert*, supra, 306 Conn. 226. A *Porter* analysis, however, is a "further hurdle," beyond the general qualification requirements, for admitting expert testimony based on "scientific" evidence and methods. See *State v. Guilbert*, supra, 230–31. Rather than assessing a witness' *qualifications* (i.e., his knowledge and experience), a *Porter* analysis assesses the witness' *methods* (i.e., his reasoning and procedures) used to reach his conclusions. An expert might be qualified to discuss a particular topic, but nevertheless have his opinion excluded because the methods he used to reach that opinion were unreliable. For example, in *Klein v. Norwalk Hospital*, supra, 299 Conn. 262–63, we concluded that the trial court improperly admitted certain scientific evidence because it did not meet the requirements of *Porter*. In *Klein*, the defendant offered the opinion of an expert witness that the plaintiff's decedent suffered from Parsonage Turner Syndrome, a rare condition. Id., 260. The witness, who had treated patients with the syndrome, diagnosed the decedent solely based on a review of the decedent's medical records. Id. Although the witness clearly was qualified to testify about the nature of Parsonage Turner Syndrome based on his experience, the defendant did not present any evidence to support the reliability of the witness' method for diagnosing the condition. Id., 262–64. With no evidence to show that this rare condition could be reliably diagnosed simply through a review of medical records, we concluded that the witness' own experience with treating it was not enough to prove the validity of his method for diagnosis. Id.

The Appellate Court's reliance on a *Porter* analysis in the present case was, however, not appropriate because the defendants did not raise a *Porter* claim in the trial court. To raise a *Porter* claim, the party opposing the admission of the scientific evidence must first object to the validity of the expert's methods. *State v. Porter*, supra, 241 Conn. 87. Once the opponent objects, the proponent of the scientific evidence must demonstrate that the methods underlying the evidence are reliable and, therefore, valid. Id., 84–87. The failure to raise a *Porter* claim in the trial court results in waiver of that claim and it will not be considered for the first time on appeal. *United Technologies Corp. v. East Windsor*, 262 Conn. 11, 30, 807 A.2d 955 (2002). The defendants in this case did not raise a *Porter* claim in the trial court

because the defendants objected to the admission of the witnesses' causation opinions only on the ground that the witnesses were not qualified by their knowledge or experience to render an opinion on the topic of the cause of stillbirth. The trial court therefore did not hold a hearing, receive testimony, or render a decision on the validity of the witnesses' methods for determining the cause of stillbirth. By assessing the witnesses' methods for the first time on appeal, the Appellate Court essentially deprived the plaintiffs of the opportunity to present evidence supporting their methods for determining the cause of stillbirth and improperly held this lack of evidence against the plaintiffs.[3]

### C

In light of our conclusions in parts II A and B of this opinion, we consider whether the trial court's improper exclusion of the plaintiffs' expert testimony requires reversal of the judgment and a remand for a new trial. When a court commits an evidentiary impropriety, we will reverse the trial court's judgment only if we conclude that the trial court's improper ruling harmed the plaintiffs. *Sullivan* v. *Metro-North Commuter Railroad Co.*, supra, 292 Conn. 158. In a civil case, a party proves harm by showing that the improper evidentiary ruling likely affected the outcome of the proceeding. *Poulos* v. *Pfizer, Inc.*, 244 Conn. 598, 614, 711 A.2d 688 (1998).

We conclude that the trial court's decision harmed the plaintiffs in this case. The preclusion of the plaintiffs' causation evidence formed the basis for the trial court's decision to grant the defendants' motion for a directed verdict and to render judgment in the defendants' favor. With that causation evidence, the plaintiffs likely would have sustained their burden of proof, resulting in the denial of the defendants' motion for a directed verdict and allowing them to submit their case to the jury. The plaintiffs are therefore entitled to a new trial.

### III

In addition to their dispositive claim on appeal, the plaintiffs also have raised three additional evidentiary claims on issues previously addressed by the trial court and that are likely to arise again on remand. Specifically, the plaintiffs claim that the trial court improperly: (1) precluded a treating physician from testifying about his opinion that Weaver developed gestational diabetes in the later stages of her pregnancy; (2) precluded a treating nurse from testifying about her "suspicion" that Weaver had gestational diabetes and her concerns about the treatment given by Amdur; and (3) allowed the defendants to question Jelsema about a censure he received from the American College of Obstetricians and Gynecologists (College), a voluntary membership professional organization. The Appellate Court did not address these issues because it affirmed the trial court's judgment rendered in favor of the defendants. In light

of our decision to remand the case for a new trial, and because these issues are likely to arise again on remand, we address them here, in turn.

A

In addition to expert testimony from Jelsema and Bottiglieri, the plaintiffs offered McKnight, the physician who delivered the decedent, to testify that Weaver suffered from late term gestational diabetes, an opinion McKnight expressed to Weaver while she was still in the hospital after her cesarean section. After discovering that the decedent had died in utero, McKnight ordered certain tests to look for a cause. Results from these tests showed that Weaver had elevated blood sugar levels when she came in for delivery, suggesting poor blood sugar control. Within one day of the delivery, while Weaver was still in the hospital, McKnight spoke with Weaver and told her that "it looks like she had developed poor [blood] sugar control at the end of her pregnancy . . . ." McKnight testified at his deposition that, at the time he spoke with Weaver, he had formed the opinion that she had developed gestational diabetes in the later stages of her pregnancy.

The defendants moved to preclude the plaintiffs from offering McKnight's opinions into evidence. The defendants argued that McKnight's opinion that Weaver had gestational diabetes related to the standard of care and could not be admitted because: (1) the plaintiffs did not disclose McKnight as a standard of care expert; and (2) his opinions were based on information not available to Amdur. The defendants feared that the plaintiffs would use McKnight's opinion about Weaver's condition as improper standard of care evidence by presenting "McKnight as a treating physician who reached a conclusion that the [plaintiffs claim Amdur] negligently failed to reach." The plaintiffs responded that McKnight's opinion about Weaver's condition was not a standard of care opinion. The plaintiffs offered it instead to resolve a key factual dispute in the case, namely, whether Weaver in fact had gestational diabetes, a fact the defendants contested, which related to the issue of causation.[4]

The trial court granted the defendants' motion, apparently concluding that McKnight's opinion related to the standard of care issue and was impermissible. The trial court explained its decision as follows: "I'm going to grant the motion in limine to preclude the [plaintiffs] from asking [McKnight] questions as to the standard of care or that relate to the standard of care in this case. That includes opinions which he may have arrived at. It does not preclude, however, [McKnight] from being a witness in this case as to the facts that he was aware of or his conduct or tests that he may or may not have ordered but he may not be asked his opinion as to those facts as it relates to whether or not [Weaver] had gestational diabetes." The trial court also precluded the

plaintiffs from asking McKnight why he ordered any tests, including those to determine Weaver's blood sugar levels, or whether the test results were elevated or significant to him.

We agree with the plaintiffs that the precluded opinion testimony was not a standard of care opinion and that the trial court abused its discretion in concluding otherwise. Standard of care opinions establish two critical elements of a medical malpractice claim: (1) what the standard of care required the defendant to do in the particular circumstances of the case; and (2) whether the defendant deviated from that standard. See *Dimmock* v. *Lawrence & Memorial Hospital, Inc.*, 286 Conn. 789, 813, 945 A.2d 955 (2008) (to succeed in malpractice claim, plaintiff must prove: "[1] the requisite standard of care for treatment, [2] a deviation from that standard of care, and [3] a causal connection between the deviation and the claimed injury" [internal quotation marks omitted]). The plaintiffs did not offer any opinion from McKnight on any of those issues. Indeed, the plaintiffs expressly represented that they would not offer any opinion from McKnight on any of the elements of a malpractice action, namely: (1) what the standard of care required of Amdur in the circumstances; (2) whether Amdur's conduct deviated from that standard; and (3) whether that deviation caused the decedent's stillbirth. The plaintiffs, instead, offered McKnight's opinion, formed at the time he treated Weaver, that she had gestational diabetes. Our courts previously have allowed treating physicians to testify to opinions formed during treatment when those opinions do not constitute standard of care opinions. See, e.g., *Wyszomierski* v. *Siracusa*, 290 Conn. 225, 233–36, 963 A.2d 943 (2009) (upholding trial court's decision to allow treating physician to testify about opinions formed during treatment, but not about standard of care); cf. *Milliun* v. *New Milford Hospital*, supra, 310 Conn. 741 and n.20 (noting, without reviewing, Appellate Court's conclusion that treating physicians can testify to opinions formed during treatment); see also *Lane* v. *Stewart*, 46 Conn. App. 172, 176, 698 A.2d 929 (1997) ("[t]here is no justification for a rule that would wholly exempt experts from placing before a tribunal factual knowledge relating to the case in hand [or] opinions already formulated" [internal quotation marks omitted]), cert. denied, 243 Conn. 940, 702 A.2d 645 (1997). To be sure, McKnight's opinion would have helped establish that gestational diabetes caused the decedent's stillbirth, a fact relevant to the plaintiffs' causation theory. Nevertheless, its relevance to the plaintiffs' causation theory does not turn McKnight's opinion into one on the standard of care. To the extent that there was any danger that the jury might misuse McKnight's opinion on Weaver's condition to determine how Amdur should have acted in this case, that danger could have been addressed with a limiting instruction rather than

precluding the testimony altogether. Accordingly, we conclude that the trial court abused its discretion by precluding it on the basis that McKnight's opinion was an improper standard of care opinion.

The defendants alternatively claim that we should uphold the trial court's decision to preclude McKnight's opinion about Weaver's condition because it was not a proper expert opinion, stated to a degree of probability.[5] The defendants, citing to portions of McKnight's deposition transcript, posit that McKnight opined only that test results were "simply 'suggestive' " of gestational diabetes, but did not state an opinion, based on a reasonable degree of medical probability, that Weaver, in fact, had gestational diabetes. We disagree.

McKnight clearly expressed an opinion during his deposition that Weaver developed gestational diabetes in the late stages of her pregnancy. "Expert opinions must be based upon reasonable probabilities rather than mere speculation or conjecture if they are to be admissible in establishing causation. . . . To be reasonably probable, a conclusion must be more likely than not. . . . Whether an expert's testimony is expressed in terms of a reasonable probability . . . does not depend upon the semantics of the expert or his use of any particular term or phrase, but rather, is determined by looking at the entire substance of the expert's testimony." (Emphasis omitted; footnote omitted; internal quotation marks omitted.) *Milliun* v. *New Milford Hospital*, supra, 310 Conn. 730. At his deposition, McKnight testified that he told Weaver while she was in the hospital that "it looks like she had developed poor [blood] sugar control at the end of her pregnancy . . . ." The plaintiffs' counsel then asked McKnight: "So as of that point in time [when] you had the conversation with [Weaver], was it your opinion that she did develop gestational diabetes in the later stages of her pregnancy?" McKnight answered: "Yes." McKnight further testified that he based his opinion on the test results showing that Weaver had above normal blood sugar levels and the unusually large size of the decedent when delivered. Notably, McKnight was confident enough in his opinion that he relayed it to Weaver and told her that "if she were to have another pregnancy we would want to watch [her blood sugar control]." This testimony, taken together, sufficiently establishes that McKnight held his opinion to a reasonable degree of probability. See *Milliun* v. *New Milford Hospital*, supra, 729–33 (medical reports stating physician's "opinion" about patient's condition and basis for that opinion sufficient to satisfy probability requirement). We therefore disagree that the trial court could have precluded the opinion on this basis.

B

In addition to McKnight, the plaintiffs also offered the testimony of Hess, the nurse who attended to Weaver on

her regular prenatal visit the week before her cesarean section. Around the time of that visit, Hess noticed that Weaver had tested positive for high levels of sugar in her urine and that an ultrasound showed that the fetus was unusually large for its gestational age. During her deposition, Hess testified that, after reviewing the test results, she had a "suspicion that [Weaver] could potentially" have uncontrolled gestational diabetes and called Amdur to notify him of the results. Hess further testified that she was surprised when Amdur did not order any further tests to assess the fetus' health, but, instead, instructed Hess to schedule Weaver for a cesarean section the following week.

The defendants moved to preclude Hess' opinions about her "suspicion" and "surprise" on the same grounds that they moved to exclude McKnight's opinion testimony. The trial court granted the motion, explaining that Hess could testify about "whatever acts she did or didn't do in connection with her interaction with [Amdur]" but could not testify to her "expectations, impressions, concerns, [or] suspicions" because they related to standard of care and could not properly be offered on that basis.

The trial court properly exercised its discretion in precluding these opinions. Unlike McKnight's opinion, the plaintiffs offered Hess' testimony about her suspicion and her surprise to criticize Amdur's actions under the circumstances. Specifically, unlike the plaintiffs' offer of McKnight's testimony to resolve the factual issue of whether Weaver actually had gestational diabetes, the plaintiffs told the trial court that they were offering Hess' "suspicion" that Weaver had gestational diabetes to prove that Amdur also should have suspected this condition at the time he told Hess to schedule a cesarean section for the following week.[6] In addition, Hess' "surprise" that Amdur did not order further testing at that time to assess the fetus' health states Hess' opinion about what Amdur should have done under the circumstances. This testimony bears on the level of care that Hess believed Amdur should have exercised (i.e., whether Amdur should also have suspected that Weaver had gestational diabetes) and whether he deviated from that standard by failing to detect Weaver's condition and by not taking further steps to assess the fetus' health. The plaintiffs did not, however, disclose or qualify Hess as a standard of care expert, rendering this testimony inadmissible. See, e.g., *Friedman* v. *Meriden Orthopaedic Group, P.C.*, 272 Conn. 57, 69, 861 A.2d 500 (2004); *Wright* v. *Hutt*, 50 Conn. App. 439, 450–51, 718 A.2d 969, cert. denied, 247 939, 723 A.2d 320 (1998). The trial court thus acted within its discretion by precluding this testimony from Hess.

C

The plaintiffs also claim that the trial court improp-

erly allowed the defendants to question Jelsema about a censure he received from the College. Jelsema testified that he is affiliated with several professional organizations, including the College, which is a private organization whose members are obstetricians and gynecologists. It is not a professional licensing board, and membership in the College is entirely voluntary. Jelsema has been a member of the College for more than twenty years. Currently, he serves as an editor for one of the organization's publications. The College censured him in 2009 for violating a section of its Code of Professional Ethics that prohibited any member who serves as an expert witness from testifying falsely and about matters outside the member's area of expertise. During questioning at trial, outside the presence of the jury, Jelsema testified that he had been censured, but he denied that he had ever testified falsely or about matters beyond his area of expertise. He also testified that, notwithstanding the censure, no court had ever cited him for perjury and, in the case at issue in the censure, the court admitted Jelsema's opinions into evidence. There is no evidence in the record that the censure has affected Jelsema's membership status in the College. His membership was not suspended or terminated, and he remains a full member. The trial court, over the plaintiffs' objection, nevertheless allowed the defendants to question Jelsema about the censure after concluding that "it's clearly relevant to the veracity of the witness . . . ."[7]

The plaintiffs argue that the admission of this testimony was improper because the censure is improper extrinsic evidence of alleged prior misconduct. The plaintiffs acknowledge that under our rules of evidence, a party may ask a witness about prior misconduct if that misconduct bears on the witness' credibility. The plaintiffs assert, however, that a party may not use extrinsic evidence to prove the misconduct and that allowing the defendants to question Jelsema about the censure is tantamount to admitting extrinsic evidence to prove he testified falsely and beyond his expertise in the prior case. We agree with the plaintiffs.

We first set forth our standard of review. "To the extent [that] a trial court's admission of evidence is based on an interpretation of [our law of evidence], our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law, however, for an abuse of discretion. . . . The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. . . . Thus, [w]e will make every reasonable presumption in favor of upholding the trial court's ruling[s] [on these bases] . . . . In determining whether

there has been an abuse of discretion, the ultimate issue is whether the court . . . reasonably [could have] conclude[d] as it did." (Citations omitted; internal quotation marks omitted.) *State* v. *Davis*, 298 Conn. 1, 10–11, 1 A.3d 76 (2010).

Our evidentiary rules generally prohibit the use of character evidence to prove that a person has acted in conformity with a character trait on a particular occasion, subject to limited exceptions. See Conn. Code Evid. § 4-4 (a). One exception allows the admission of evidence of a witness' character for "truthfulness or untruthfulness to impeach or support the credibility of the witness." Conn. Code Evid. § 4-4 (a) (3). One method for impeaching a witness' credibility allows a party to cross-examine a witness about the witness' prior misconduct (other than a felony conviction, which is governed by other rules), subject to certain limitations: "First, cross-examination may only extend to specific acts of misconduct other than a felony conviction if those acts bear a special significance upon the issue of veracity . . . . Second, [w]hether to permit cross-examination as to particular acts of misconduct . . . lies largely within the discretion of the trial court. . . . Third, extrinsic evidence of such acts is inadmissible." (Internal quotation marks omitted.) *State* v. *Chance*, 236 Conn. 31, 60, 671 A.2d 323 (1996); see also Conn. Code Evid. § 6-6 (b) (2). Under these limitations, the only way to prove misconduct of a witness for impeachment purposes is through examination of the witness. See, e.g., *Martyn* v. *Donlin*, 151 Conn. 402, 408, 198 A.2d 700 (1964). The party examining the witness must accept the witness' answers about a particular act of misconduct and may not use extrinsic evidence to contradict the witness' answers. *State* v. *Chance*, supra, 60.

Turning to the present case, the first two requirements for prior misconduct impeachment were met. First, the censure from the College is relevant to Jelsema's credibility. A panel of the College's members concluded that Jelsema violated the organization's rules of conduct by, among other things, testifying falsely as an expert witness in a previous case. A claim that the witness gave false testimony in a prior case is directly relevant to a witness' credibility. See, e.g., *State* v. *Bova*, 240 Conn. 210, 223, 690 A.2d 1370 (1997). Second, the trial court exercised its discretion to allow the defendants to cross-examine Jelsema about his allegedly false testimony in the prior case.

The third requirement presents a more difficult question because it is not clear under our law whether allowing the defendants to question Jelsema about his censure is equivalent to admitting extrinsic evidence of the prior misconduct. Our case law clearly allows a party to ask a witness whether the witness previously engaged in the alleged bad act. *State* v. *Chance*, supra, 236 Conn. 60–61. It also clearly prohibits a party from

introducing exhibits or calling another witness to prove that the witness committed the prior bad act. Id. The issue in the present case, however, lies somewhere between these two extremes: whether the prohibition on extrinsic evidence precludes cross-examination of the witness about another's determination that the witness acted untruthfully. We have not been pointed to, and are not aware of, any cases from this state directly addressing this question. Several of our trial courts, with the exception of the trial court in this case, have, however, refused to allow a party to cross-examine a witness about a censure issued to the witness by a voluntary membership organization, finding any testimony about the censure to be irrelevant and based on unduly prejudicial hearsay. See, e.g., *D'Attilo* v. *Viscarello*, Superior Court, judicial district of Waterbury, Docket No. UWY-CV-05-4010135S (April 8, 2009); *Sherwood* v. *Ogiela*, Superior Court, judicial district of Waterbury, Docket No. X02-CV98-0163648S (March 9, 2007); *Hall* v. *Mansfield OB/GYN Associates, P.C.*, Superior Court, judicial district of Tolland, Docket No. X07-CV02-78138 (May 2, 2005).

Commentators and courts in other jurisdictions have addressed this question and generally have concluded that "counsel should not be permitted to circumvent the no-extrinsic-evidence provision by tucking a third person's opinion about prior acts into a question asked of the witness who has denied the act." S. Saltzburg, "Trial Tactics: Impeaching the Witness: Prior 'Bad Acts' and Extrinsic Evidence," 7 Crim. Just. 28, 31 (Winter 1993). The commentary to the federal Rules of Evidence, citing the Saltzburg article, expressly prohibits a party from questioning a witness about any consequences arising from the alleged misconduct. Fed. R. Evid. 608, commentary to 2003 amendment ("[T]he extrinsic evidence prohibition of [r]ule 608 [b] bars any reference to the consequences that a witness might have suffered as a result of an alleged bad act. For example, [r]ule 608 [b] prohibits counsel from mentioning that a witness was suspended or disciplined for the conduct that is the subject of the impeachment, when that conduct is offered only to prove the character of the witness."). According to Professor Charles T. McCormick, "[i]t is improper to inquire whether the witness was 'fired,' 'disciplined,' or 'demoted' for the alleged act—those terms smuggle into the record implied hearsay statements by third parties who may lack personal knowledge." 1 C. McCormick, Evidence (6th Ed. 2006) § 41, p. 183. The Third Circuit Court of Appeals squarely addressed this issue in *United States* v. *Davis*, 183 F.3d 231, 257 n.12 (as amended by slip opinion, 197 F.3d 662, 663 n.1) (3d Cir. 1999), and concluded that, during cross-examination of a police officer, "the government cannot make reference to [the witness'] forty-four day suspension or that Internal Affairs found that he lied about the [prior] incident.

The government needs to limit its cross examination to the *facts underlying* those events. . . . If he denies that such events took place, however, the government cannot put before the jury evidence that he was suspended or deemed a liar by Internal Affairs." (Emphasis in original.) See also *United States* v. *Holt*, 486 F.3d 997, 1001–1002 (7th Cir. 2007) (trial court properly precluded party from examining witness about suspension for prior misconduct).[8]

Professor Colin C. Tait and Judge Eliot D. Prescott, in their treatise about Connecticut evidence law, also agree that a witness cannot be asked about the opinions of others regarding the alleged misconduct. C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 6.32.5, p. 362. They refer to this court's decision in *State* v. *Bova*, supra, 240 Conn. 210, as an example. In *Bova*, the court upheld a trial court's decision to preclude a party from asking a police officer about another case in which a judge commented that another witness was more credible than the police officer. Id., 222–24. This court concluded that the judge's comment in the other case did not meet the first requirement for admitting misconduct testimony because the judge made no express finding that the officer lied, and therefore the comment did not sufficiently relate to the officer's credibility. Id. Professor Tait and Judge Prescott go further in their treatise, explaining that counsel could not have asked the officer about the judge's comment "[e]ven if the judge had found that the officer lied as a witness [because] that finding is not a conviction of perjury. Such conduct, not being a conviction, can be proved only by questions addressed to the witness, i.e., 'Did you lie in case X?' If the witness denies such misconduct, the questioner must 'take' the witness's answer and cannot introduce extrinsic evidence." C. Tait & E. Prescott, supra, p. 362; but see footnote 7 of this opinion.

The reasons for prohibiting such questions are the same reasons for precluding extrinsic evidence in the first place. Prohibiting a party from introducing extrinsic evidence of misconduct, either through the witness, exhibits, or other witnesses, prevents a trial within a trial on the collateral question of whether the witness did, in fact, commit the alleged misconduct. See, e.g., 1 C. McCormick, supra, pp. 182–84; 81 Am. Jur. 2d 767, Witnesses § 867 (2004). Such a minitrial about a collateral issue distracts from the main issues at trial, wastes the court's and the jury's time, and is frequently based on hearsay evidence of questionable value. 1 C. McCormick, supra, p. 183 (allowing parties to cross-examine witness about extrinsic proof of misconduct will "smuggle into the record implied hearsay statements by third parties who may lack personal knowledge"); 81 Am. Jur. 2d, supra, § 867, p. 767 ("[s]uch evidence is rejected because of the confusion of issues and the waste of time that would be involved"). The Third Circuit described the risk as follows: "Allowing

such a line of questioning not only puts hearsay statements before the jury, it injects the views of a third person into the case to contradict the witness. This injection of extrinsic evidence not only runs afoul of [r]ule 608 (b), but also sets the stage for a mini-trial regarding a tangential issue of dubious probative value that is laden with potential undue prejudice." *United States* v. *Davis*, supra, 183 F.3d 257 n.12, as amended by 197 F.3d 663 n.1; see also *United States* v. *Holt*, supra, 486 F.3d 1001–1002 ("asking [the witness] whether the police department had punished him would introduce the opinion of members of the police department" and "interject hearsay into the proceedings").

The facts of the present case provide a fitting example. Allowing the defendants to go beyond asking Jelsema whether he lied in the underlying case by asking him also about the College censure will turn his testimony into a minitrial on the significance and reliability of the censure. Furthermore, the minitrial would consist almost entirely of Jelsema's testimony about the hearsay opinions of certain members of the College who lacked personal knowledge about Jelsema's underlying conduct in the prior case. The plaintiffs contend that the censure is unreliable because it is the product of a biased organization and a proceeding that provided Jelsema with no meaningful due process. According to the plaintiffs, the College spends significant resources lobbying for tougher medical malpractice liability caps to protect obstetricians and gynecologists from liability. The plaintiffs also argue that the College's censure proceedings are intended to deter its members from testifying on behalf of plaintiffs in malpractice cases, citing evidence that the organization has censured only members that testified for plaintiffs. Furthermore, Jelsema testified that he was not provided a meaningful opportunity to defend himself: he could not speak for more than thirty minutes before the disciplinary panel, could not call expert witnesses in his favor, and could not cross-examine witnesses against him. Jelsema also denies that he testified falsely in the prior case. The defendants disputed these claims and cross-examined Jelsema, using the College's procedures and publications, to challenge his characterization of the censure proceedings. This is exactly the type of time wasting dispute over a collateral issue that the bar on extrinsic evidence is intended to prevent.

On the basis of these considerations, we conclude that the prohibition on introducing extrinsic evidence to contradict a witness who has denied the alleged prior misconduct extends to cross-examining that witness about the opinions of third parties regarding that misconduct and whether the witness suffered any consequences as a result.[9] We previously have held that a party can ask questions of a witness about the underlying misconduct, but may not introduce evidence to contradict the witness' answers. *State* v. *Chance*, supra,

236 Conn. 60; *Demers* v. *State*, 209 Conn. 143, 157, 547 A.2d 28 (1988) ("if on cross-examination a witness denies having engaged in . . . prior acts of misconduct, the examiner must accept the answer and is prohibited from offering extrinsic evidence to prove such acts"). Our conclusion is consistent with that principle.

Turning back to the present case, we conclude that the testimony concerning the censure by the College is extrinsic evidence of an alleged prior misconduct and, thus, inadmissible. The alleged misconduct at issue here was Jelsema's testimony in the prior case, not the censure itself. When asked at trial, Jelsema denied that he testified falsely or beyond his expertise in the prior trial. Nevertheless, the trial court allowed the defendants to question Jelsema about the censure, using the fact of the censure to contradict Jelsema's denial and prove that he had testified falsely and beyond his expertise in a prior case. Jelsema's censure is extrinsic evidence of the alleged bad act because it reflects the opinion of certain of the College's members that Jelsema did, in fact, commit the alleged bad acts. The defendants could not have called the members of the College grievance committee to testify about the censure, nor could they have introduced documents reflecting the censure into evidence. *State* v. *Chance*, supra, 236 Conn. 60–61. We see no principled reason for allowing the defendants to circumvent these prohibitions by presenting that same evidence through Jelsema. The collateral nature of the censure, and the risk that its admission will lead to a minitrial about its reliability are the same regardless of how the censure is admitted into evidence. Accordingly, we conclude that the trial court improperly permitted the defendants to question Jelsema about the censure.

The defendants argue, in the alternative, that the censure was also relevant to Jelsema's qualifications. We disagree. The censure did not affect Jelsema's right to practice medicine because the College is not a professional licensing organization; membership is strictly voluntary. Nor has the censure affected Jelsema's membership in that organization. He remains a member and serves as an editorial consultant for one of its publications. The plaintiffs represented to the trial court that they would not use Jelsema's membership in the College to help establish his qualifications as an expert in the field of obstetrics and gynecology if such testimony would "[open] the door" to allowing testimony about the censure. Most importantly, the censure itself does not bear on the scope of Jelsema's knowledge or experience with the issues in this case. To be sure, part of the basis for the censure was a finding by the College that Jelsema testified beyond his expertise in a different case. But we have no evidence in the record to determine whether the issues in that other case are at all similar or related to those in the present case. Notably, the court in the prior case admitted Jelsema's expert

testimony, contradicting the finding underlying the censure. The censure itself therefore does not inform us about whether Jelsema is qualified on the subjects at issue in this case. We thus disagree that the censure was admissible on this alternative basis.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the trial court's judgment and to remand the case to that court for a new trial.

In this opinion the other justices concurred.

[1] The plaintiffs also filed their action against the named defendant, Craig McKnight, and Lawrence and Memorial Hospital but later withdrew all claims against those parties. They are no longer defendants in this action and are not parties to this appeal.

[2] The trial court also implicitly concluded that Jelsema and Bottiglieri were not qualified to testify about the cause of stillbirth because neither of them is a board certified pathologist. The Appellate Court properly rejected this argument. See *Weaver* v. *McKnight*, supra, 134 Conn. App. 665. Specialized certifications or degrees are not prerequisites to qualification for medical causation opinions. *Fitzmaurice* v. *Flynn*, 167 Conn. 609, 618, 356 A.2d 887 (1975) ("[i]t is the scope of the [witness'] knowledge and not the artificial classification by title that should govern the threshhold question of admissibility"); but see General Statutes § 52-184c (specializations relevant to admission of standard of care opinion).

[3] The Appellate Court likely turned to a *Porter* analysis because the defendants challenged the factual basis for the witnesses' opinions. But rather than reviewing whether the experts' opinions had a basis in relevant *facts*, the Appellate Court analyzed the validity of the witnesses' *methods* used to reach their opinions based on those facts. The "factual basis" inquiry is, however, not a "backdoor" for introducing a *Porter* claim into the case when that issue has not previously been raised. As described in part II A 3 of this opinion, the factual basis inquiry is part of determining an expert's qualification to render an opinion. One of the requirements for qualifying an expert is that his expertise and opinions must be helpful to the fact finder. To be helpful, an expert opinion must have some basis in relevant facts—whether those facts are in the record or presented through a hypothetical question—to ensure that the opinion is not entirely speculative or irrelevant to the issues in the case. See, e.g., *State* v. *Asherman*, 193 Conn. 695, 716–17, 478 A.2d 227 (1984); see also *Milliun* v. *New Milford Hospital*, supra, 310 Conn. 730 n.13 (expert opinion must be based on relevant facts supported by evidence). For example, in *Glaser* v. *Pullman & Comley, LLC*, 88 Conn. App. 615, 629, 871 A.2d 392 (2005), a legal malpractice case, the Appellate Court upheld a trial court's preclusion of an expert opinion about Connecticut law when the witness testified that he did not base his opinion on Connecticut law, but instead used "national standards." (Internal quotation marks omitted.) Because the issue in the malpractice case involved Connecticut law, the expert's opinion lacked a valid basis in relevant facts and therefore would have been unhelpful to the jury. Id.

[4] The defendants contend that the plaintiffs did not argue in the trial court that McKnight's opinion related to causation and, therefore, are precluded from making this argument on appeal. We disagree. The plaintiffs repeatedly made this assertion before the trial court during the argument on the defendants' objection to the admission of McKnight's opinion testimony.

[5] The trial court did not base its decision on this argument and the defendants did not raise it as an alternative ground for affirming the trial court's decision. Nevertheless, because the parties have briefed this alternative ground and the plaintiffs have not objected to our review of it, we address it here. See, e.g., *Milliun* v. *New Milford Hospital*, 129 Conn. App. 81, 99 n.13, 20 A.3d 36 (2011).

[6] The trial court also could have properly precluded this testimony because Hess' suspicion did rise to the level of an opinion held to a reasonable degree of medical probability. Hess repeatedly testified during her deposition that she had a "suspicion" about the "possibility" that Weaver developed gestational diabetes, but did not testify that she came to the conclusion that Weaver actually had that condition. The plaintiffs' counsel acknowledged this during argument on the defendants' objection to the admission of her testimony, telling the trial court that, "we are not saying [Hess] developed

the opinion within a reasonable degree of medical probability that [Weaver] had late onset gestational diabetes, [Hess] did not get involved in subsequent care, she didn't reach that point."

[7] The defendants claim that the record is inadequate for review on this issue because the trial court did not articulate its basis for allowing the censure into evidence. We disagree. The trial court expressly stated that it admitted the censure because it was relevant to the credibility of the witness, which directly implicates our rules of impeachment for credibility using prior acts of misconduct. See Conn. Code Evid. §§ 4-4 and 6-6. We therefore conclude that the record sufficiently reveals the basis for the trial court's decision and is adequate for our review.

[8] Some courts, however, have held that a party may cross-examine a witness about consequences of misconduct when the witness has been found to have testified falsely by a court or a state administrative agency, but was not convicted of perjury. See, e.g., *United States* v. *Cedeno*, 644 F.3d 79, 82–83 (2d Cir. 2011); *United States* v. *Dawson*, 434 F.3d 956, 958–59 (7th Cir. 2006); *United States* v. *Whitehead*, 618 F.2d 523, 529–30 (4th Cir. 1980). Because there is no such finding in this case, we do not address these exceptions.

[9] We do not decide whether a witness may be asked about a determination by a judicial, state administrative agency, or licensing board, not resulting in a perjury conviction, that the witness testified untruthfully in a prior proceeding. See footnote 7 of this opinion.